## UNITED STATES v. ATCHISON, T. & S. F. RY. CO.

(District Court, D. Arizona. April 10, 1914.)

No. 92.

1. MASTER AND SERVANT (§ 17*)—HOURS OF SERVICE LAW—VIOLATION—PRIMA FACIE CASE.

Where, in an action by the United States to recover a penalty against an interstate carrier for a violation of the Hours of Service Law (Act Cong. March 4, 1907, c. 2939, 34 Stat. 1415 [U. S. Comp. St. Supp. 1911, p. 1321]), the complaint alleged, and defendant in its answer admitted, that it had required or permitted its employés on the train in question to remain on duty for a longer period than 16 consecutive hours, a prima facie case of liability was established.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 16; Dec. Dig. § 17.*]

2. MASTER AND SERVANT (§ 13*)—RAILROADS—HOURS OF SERVICE LAW—"TERMINAL"—"END OF THE RUN."

Hours of Service Law (Act Cong. March 4, 1907, c. 2939, § 3, 34 Stat. 1416 [U. S. Comp. St. Supp. 1911, p. 1322]), provides that the act shall not apply in any case of casualty or unavoidable accident or act of God, or where the delay is the result of a cause not known to the carrier, or its officer or agent in charge of the employé at the time he left a terminal and which could not have been foreseen. *Held*, that where a passenger train was delayed after the train crew had left their starting point, by the derailment of a freight train, resulting in the passenger crew being required to remain on duty more than 16 hours, the railroad company was not bound to tie up the train at the first stopping place where its crew could have been replaced, but was entitled, without incurring liability, to operate the train to the end of the passenger crew's run, the word "terminal" as used in such section being synonymous with the "end of the run" of the particular employé involved.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**3. Master and Servant (§ 13*)—Railroads—Hours of Service Law—Violation—Reason for Delay.**

   Where a revenue train operated in interstate commerce was delayed so as to require the crew to remain on duty longer than 16 hours, limited by Hours of Service Law (Act Cong. March 4, 1907, c. 2939, 34 Stat. 1415 [U. S. Comp. St. Supp. 1911, p. 1321]), by the unnecessary hauling of a foreign freight car, which contained neither live stock nor perishable freight, by means of a chain, after its drawhead had become broken, in violation of Safety Appliance Act March 4, 1911, c. 285, 36 Stat. 1397 (U. S. Comp. St. Supp. 1911, p. 1338), making it unlawful to haul a defective car by means of chains in revenue trains, or in association with other cars commercially used, unless they contain live stock or perishable freight, the delay was not the result of casualty or unavoidable accident within the exception of the Hours of Service Law, and hence the railroad company was liable for the penalty prescribed.

   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 14; Dec. Dig. § 13.*]

Action by the United States of America against the Atchison, Topeka & Santa Fé Railway Company, to recover for violation of the Hours of Service Law. Judgment for defendant on the first three counts of the complaint, and for the United States on the remaining counts.

J. E. Morrison, U. S. Atty., of Bisbee, Ariz., O. T. Richey, Asst. U. S. Atty., of Phœnix, Ariz., and M. C. List, Sp. Asst. Atty. Gen., of Washington, D. C., for the United States.

Paul Burks, of Los Angeles, Cal., for defendant.

SAWTELLE, District Judge. This is an action brought by the United States against the Atchison, Topeka & Sante Fé Railway Company, under the provisions of the act of Congress of March 4, 1907 (Act March 4, 1907, c. 2939, 34 Stat. 1415 [U. S. Comp. St. Supp. 1911, p. 1321]), entitled, "An act to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon."

Section 2 of said act is as follows:

"That it shall be unlawful for any common carrier, its officers or agents, subject to this act to require or permit any employé subject to this act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employé of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive hours off duty."

Section 3 provides "that any such common carrier, or any officer or agent thereof, requiring or permitting any employé to go, be or remain on duty," in violation of said second section above quoted, "shall be liable to a penalty of not to exceed five hundred dollars for each and every violation."

The first three counts of the government's complaint relate to the conductor and two brakemen in charge of defendant's train No. 18, on October 4 and 5, 1912.

No. 18 was a mail, passenger and express train running between Los Angeles, Cal., and Phœnix, Ariz., and in the course of its run

---
*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

passed through San Bernardino, Barstow, and Parker. Los Angeles was the initial terminal or starting point for this train, for its engine crew and also for its train crew, that is, its conductor and brakemen. The final destination of the engine crew was Barstow, of the train crew was Parker, and of the train itself was Phœnix. The scheduled running time of this train between Los Angeles and Parker was as follows:

| | |
|---|---|
| Leave Los Angeles | 2:00 p. m. |
| Arrive Barstow | 7:15 p. m. |
| Leave Barstow | 7:40 p. m. |
| Arrive Parker | 1:15 a. m. |

Under the rules of the company the train crew were required to go on duty at Los Angeles at 1:30 p. m., so that under ordinary conditions these employés, on their regular run, would be on duty 11 hours and 45 minutes. On the particular days in question the movement of this train was as follows:

| | |
|---|---|
| Train crew reported for duty | 1:30 p. m. |
| Left Los Angeles | 2:00 p. m. |
| Arrived Summit | 6:20 p. m. |
| Left Summit | 11:55 p. m. |
| Arrived Barstow | 2:10 a. m. |
| Left Barstow | 2:20 a. m. |
| Arrived (off duty) Parker | 8:47 a. m. |

The train crew, therefore, was kept in continuous service for a period of 19 hours and 17 minutes.

The defendant, in its answer, admitted the excess service of the train crew, but set up an affirmative defense, to wit, that all of the excess service was due to the detention of train No. 18 at Summit by reason of a casualty or unavoidable accident unknown to the carrier, and which could not have been foreseen at the time No. 18 left "said terminal at Los Angeles." The answer (as amended) also alleged that train No. 18 did not leave "a terminal" of the defendant after the casualty had happened, or after it was known to the defendant. The defendant, therefore, attempted to bring itself within the proviso of section 3 of the Hours of Service Act, which reads as follows:

"The provisions of this act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier .or its officer or agent in charge of such employé at the time said employé left a terminal and which could not have been foreseen."

The particular fact pleaded, and shown in evidence to be the casualty or unavoidable accident directly responsible for the excess service, was the derailment of a freight car in a west-bound freight train between Barstow and Los Angeles, known as "Extra West 954." It is not necessary here to refer particularly to the movement of Extra 954, nor to the inspection to which it was subjected before it left Barstow, for the reason that the government does not contend that it was not properly inspected, but, for the purposes of this case, admits that the breaking in two of this extra near Summit and the consequent derailment of a car and the blocking of the main line at that

point was clearly unavoidable and unknown and unforeseen to the carrier at the time train No. 18 left both Los Angeles and San Bernardino. At the time the train left Summit it was known to the officials of the company in charge of this train that the conductor and brakemen, if allowed to continue on their regular run to Parker, would be on duty over 16 consecutive hours. The evidence shows that Barstow was a terminal of the defendant for freight trains and freight crews, and also it was the terminal for one or more passenger crews running between Barstow and Bakersfield, but was not the terminal for passenger crews running between Los Angeles and Parker.

It is contended by the government that the court should direct a verdict in its favor for the following reasons: Barstow was a "terminal," within the meaning of that term in the proviso, and therefore any delays known to the officials of the company before train No. 18 left Barstow could not be accepted as an excuse, and that, even if Barstow were not a "terminal," as that term is used in the proviso, still train No. 18 was allowed to leave there, knowing that the conductor and brakemen would be in continuous service over 16 hours when a relief crew (although the evidence shows that at that time there was no passenger crew that could have been used as a relief crew on train No. 18) could have been put on this train at Barstow and relieved the old crew at any time within, or at the expiration of, the 16 hours.

[1] The complaint alleging, and defendant in its answer admitting, that the defendant had required or permitted its said employés on said train No. 18 above named to remain on duty for a longer period than 16 consecutive hours, this made a prima facie case. United States v. Kansas City Southern Ry. Co. (C. C. A. 8th Cir.) 202 Fed. 828, 121 C. C. A. 136; C., B. & Q. R. R. Co. v. United States, 195 Fed. 241, 115 C. C. A. 193.

There appear to be three separate provisions in section 2 of said act, the violation of which subjects the carrier to a penalty: (1) That it shall be unlawful for any common carrier, its officers or agents, subject to this act, to require or permit any employé subject to this act to be or remain on duty for a longer period than 16 consecutive hours; (2) and whenever any such employé of such common carrier shall have been continuously on duty for 16 hours, he shall be relieved and not required or permitted again to go on duty until he has had at least 10 consecutive hours off duty; (3) and no such employé who has been on duty 16 hours in the aggregate in any 24-hour period shall be required or permitted to continue or again go on duty without having had at least 8 consecutive hours off duty.

Section 3 of said act sets forth the penalty for violation thereof, and then provides that the *provisions* (meaning all of the provisions of the act, including the one in section 2 above quoted, fixing a penalty for violation thereof) *shall not apply*—

"in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time said employé left a terminal, and which could not have been foreseen: Provided further, that the provisions of this act shall not apply to the crews of wrecking or relief trains."

[2] It is contended by the government that it was unlawful for the defendant company to have caused its employés to work or remain on duty after the 16-hour limit, longer than was necessary to reach the first proper stopping place where its crew could have been replaced, and there it should have been tied up, and that it was its—

"duty to have suitable stopping places where rest can be had for its employés, or proper places along its route proportionate to the exigencies of the business."

It has been said that this act is remedial in its nature, and should "receive such construction as will give its general purpose reasonable effect." To this we are agreed; but at the same time we cannot lend ourselves to a construction which would violate the plain letter of the act and entirely destroy the proviso therein contained. Had Congress not intended that the carriers should be relieved in case of casualty, unavoidable accident, or the act of God, it would not have inserted the proviso in the act. It is a well-known fact that this legislation was before Congress for many months, and that much testimony was taken by the several committees of that body before the final draft of the act was completed; and we must assume that Congress intended that the carriers should be excused from the penalties of the act, and that the act should not apply whenever the delay was caused by casualty, unavoidable accident, or act of God.

The plain wording of the proviso involved is:

"The provisions of this act *shall not apply* in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time said employé left a terminal, and which could not have been foreseen."

How, then, can this court assess a penalty in a case like the one at bar, where it is plainly shown that the crew were kept on duty by reason of casualty or unavoidable accident, in face of the statute, which for such causes excuses defendant? In cases of this nature, to adopt the construction contended for by the government would be equivalent to nullifying the proviso contained in the act, and would require of the defendant the performance of a duty not only not required, but expressly excused by the act itself. Had Congress intended that, in case of delay occasioned by "casualty, unavoidable accident or the act of God," the train should only be allowed to go to the first suitable stopping place and there tie up, it would have inserted such a provision in the act—one similar to the provision contained in the amendment to the Safety Appliance Act, approved March 4, 1911 (Act March 4, 1911, c. 285, 36 Stat. 1397 [U. S. Comp. St. Supp. 1911, p. 1338]). Section 4 of this act (Act April 14, 1910, c. 160, 36 Stat. 299 [U. S. Comp. St. Supp. 1911, p. 1329]) contains a proviso as follows:

"That where any car shall have been properly equipped, as provided in this act and the other acts mentioned herein, and such equipment shall have become defective or insecure while such car was being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment was first discovered to be defective or insecure *to the nearest available point where such car can be repaired*, without liability for the penalties imposed by Section Four of this Act," etc.

In this connection, it might be well to refer to the administrative rulings of the Interstate Commerce Commission, as contained in its Twenty-Second Annual Report, dated December 24, 1908. In referring to the act in question, the Commission said:

"Questions immediately arose as to its proper interpretation. With a view to explaining in so far as possible those features of the act which might be claimed to be ambiguous, the Commission issued the following administrative rulings: * * * 'Section 3. * * * Employés unavoidably delayed by reason of causes that could not, at the commencement of a trip, have been foreseen, may lawfully continue on duty to the terminal or *end of that run.*'"

Thus it appears that the Commission to which was intrusted the execution of this law, and whose duty it was to ascertain whether or not its provisions were being observed, not only ruled that, "Employés unavoidably delayed by reason of causes that could not, at the commencement of a trip, have been foreseen, may lawfully continue on duty to the terminal or end of that run," but actually used the words "terminal" and "end of that run" synonymously. In other words, they not only defined the word "terminal" to mean the equivalent of the end of that run, but actually held that employés unavoidably detained by reason of causes that could not, at the commencement of the trip, have been foreseen may "lawfully continue on duty to the terminal or end of that run." See Conference Rulings of the Commission issued April 1, 1911, page 24, Rule 287, which is as follows:

"Any employé so delayed may therefore continue on duty to the terminal or end of that run. The proviso quoted removes the application of the law to that trip."

See, also, pamphlet issued by the Interstate Commerce Commission, containing "The Hours of Service Law and the administrative rulings and opinions therein printed by order of the Commission March 25, 1912," which contains this same rule 287.

The Commission did not then believe that it was the duty of the carrier to stop the train at the first suitable stopping place and there tie up until the men could be relieved, as is contended was the duty of the railroad company in this case.

These administrative rulings were promulgated by the Commission because, as was stated by them, questions immediately arose as to the proper interpretation of the act, and with a view to explaining, in so far as was possible, those features which might be claimed to be ambiguous, the Commission adopted the rulings above quoted; and it is reasonable to suppose that such administrative rulings were intended for the guidance of the carrier and trainmen and others having to do with the movement of trains. We heartily agree with the Commission that the terms of the act "are susceptible of more than one interpretation."

That the "construction of a statute by those charged with the execution of it is always entitled to the most respectful consideration, and ought not to be overruled without potent reasons," was the rule announced at a very early day by the Supreme Court of the United States and reiterated in a very large number of cases. Heath v. Wallace, 138 U. S. 573, 11 Sup. Ct. 380, 34 L. Ed. 1063, and cases cited.

We cannot adopt the interpretation contended for by the government in this case, namely, that, if the train was delayed by reason of any of the causes set out in the proviso in section 3 of the act, the train crew may not lawfully continue on duty to the terminal or end of that run. This court holds that in such a case there is nothing in the act which requires a carrier to proceed to the next suitable stopping place and there tie up and relieve the crew, or which prevents the crew from continuing on duty and proceeding on their trip to the terminal or end of that run, which in this case was at Parker, even though at the time they left Summit, the place where the train was delayed and remained on account of the unavoidable accident or casualty which occasioned the delay, they had no reasonable expectation of being able to reach the end of their run, Parker, within the 16-hour limit. In the opinion of this court, such a construction is not authorized.

The manifest purpose and effect of this statute is to prohibit railroad companies from requiring or permitting their employés to be or remain on duty for a longer period than 16 consecutive hours, except in case of casualty, unavoidable accident, or act of God, or where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employé at the time such employé left a terminal, and which could not have been foreseen, and in case of casualty, unavoidable accident, or the act of God, or where the delay was the result of a cause not known to the carrier or its officers or agent in charge of such employé at the time such employé left a terminal, and which could not have been foreseen, preventing the train crew from completing its run or reaching its destination within 16 hours from the time of going on duty for the run, to take the case out of the operation of the statute, and to permit the crew in charge of any train delayed by such casualty or unavoidable accident or act of God, or other cause not known to or which could not have been foreseen by the officers or agent of the carrier in charge of such crew at the time the crew left a terminal, to continue on duty to the end of the run, *except* where the officers or agent of the railroad in charge of such crew or employés knew of the existence of, or could have foreseen, such casualty, accident, or act of God, or other cause of delay, before such train crew started upon its run upon which the delay occurred. *If* the officers or agent of the carrier in charge of such train crew knew of the existence of, or could have foreseen, the casualty, accident, or act of God, or other cause of delay, before such train crew started on its run, the statute would apply, regardless of the delay caused thereby, and the railroad company requiring or permitting such crew to continue on duty after 16 hours would, in such case, be liable to the penalty provided by the statute. In all other cases of casualty, unavoidable accident, or act of God, or other cause of delay, the statute would not apply. In other words, the proviso takes the case out of the operation of the statute in every instance except those in which the officers or agent in charge of the employé *knew,* or could have foreseen, the existence of the cause of the delay at the time such employé left the terminal or starting point.

The government also contends that the railroad company violated

the provisions of said act by requiring or permitting the said train crew to remain on duty after leaving Barstow, upon the theory that Barstow, although not shown to be a terminal for train No. 18, or for the crew on said train, was nevertheless a terminal, and that said act makes it unlawful for a carrier to require or permit any employé to remain on duty in violation of section 2 of said act, because the proviso in said act contained does not excuse the defendant "where the delay was the result of a cause not known to the carrier or its officers or agent in charge of such employé at the time such employé left a terminal"; in other words, that the officials of the defendant company knew of the unavoidable accident or casualty which was the cause of the delay to train No. 18 at the time said employés left Barstow, a terminal.

It does not appear that the word "terminal" has been judicially defined. According to the usage of railroad men in the United States, as shown by the evidence in this case, each train crew is assigned by the officers of the company to a definite, fixed run, beginning and ending at fixed points or places on its line of railroad; and, in my judgment, these fixed beginning and ending points of a given run for a given crew are the "terminals" of that run within the meaning of the word "terminal" as used in the proviso in section 3 of this act. In the usage of railroad men there are different "runs" for different train crews, and also different runs for different employés on the same train, and the run of an engineer on a passenger train might be different from the run of a conductor or brakeman. There may be one run for a freight crew and another run for a passenger crew, and these runs may not be, and usually are not, coterminous, and one run or several runs for freight crews may lie between the terminals of the run of a single passenger crew, and each of these runs has its own terminals. And in applying this act to a given case, regard must be had to the line of service in which the train crew or employés in question were engaged at the time of the alleged violation of the act, and to that alone.

It follows that Barstow was not a terminal for train No. 18, or for said conductor or brakemen, and that the defendant did not violate said act by requiring or permitting the employés mentioned in the complaint to be or remain on duty for a longer period than 16 consecutive hours and in requiring said train crew to continue on duty to the terminal or end of that run.

The remaining counts of the complaint relate to the employés on defendant's train Extra West and East 977. This was a freight train running from Winslow to Belmont and return, and the round trip was usually made in 14 hours. It was stipulated that the crew upon this train were kept in continuous service upon this trip for 20 hours and 15 minutes. Four causes are assigned by the answer for this excess service, to wit, a delay at Cliffs of 2 hours and 40 minutes, at Hibbard of 40 minutes, at Mile Post 315 of 15 minutes, and 50 minutes at Sunshine. The causes of delay at these places, as claimed by the company, are as follows: When the train was pulling into Cliffs, it broke in two, on account of a defective knuckle lock or lock block on a

Wheeling & Lake Erie car, causing the air brake to go into emergency and jarring the train to such an extent that several drawbars were pulled out, and one car was so badly damaged that it had to be burned. Several of the damaged cars were set out on the side track at Cliffs, but a New York Central & Hudson River car was chained up to another car in the train and hauled to Winslow. A delay at this point of 2 hours and 40 minutes was had, about 20 minutes of which was for the purpose of chaining up the said New York Central & Hudson River car. At Hibbard a delay of 40 minutes was caused by a break in two of the train, which the testimony without dispute shows to have been the result of the shock to the train at Cliffs. At Mile Post 315 there was a delay of ten minutes caused by the chain on the New York Central & Hudson River car, becoming loose and requiring a stop to tighten it. At Sunshine there was a delay of 50 minutes, which the conductor states was caused by a knuckle of one of the cars breaking and thereby causing the train to break in two. The Railroad Company, in its report to the Interstate Commerce Commission, which was under oath, states that the cause of the break in two at Sunshine was due to the breaking of the chain on the New York Central & Hudson River car. When the train left Cliffs, it was thus engaged in hauling an empty car by means of chains instead of drawbars, and it continued to haul it all the way to Winslow.

[3] It is without dispute that the train was a revenue train, and the car thus hauled by a chain did not contain live stock or perishable freight. No necessity was shown for the chaining up of this car and its haul to Winslow; and such action was a violation of the Safety Appliance Act of March 4, 1911, 36 Stat. L. 1397, which makes it unlawful to haul a defective car by means of chains instead of drawbars, in revenue trains or in association with other cars that are commercially used, unless such cars contain live stock or perishable freight.

The proviso in the statute allows the carrier credit for all lawful delays caused to a train crew on its run by casualty, unavoidable accident, or act of God, or by any cause not known to, or which could not have been foreseen, by the officers or agents of the carrier at the time the crew started from its terminal on its run, but allows no credit for delays not covered by the proviso; and, consequently, if the train is delayed by casualty, accident, act of God, or other lawful cause, for one hour at one place and another hour at another place, and then is delayed another hour at another place by a cause which was known to or could have been foreseen by the officers and agents of the carrier at the time the crew left the terminal or started on its run, and the regular schedule time of the train was 16 hours, and in consequence of the delays mentioned, the time taken for the run is 19 hours, the carrier is liable, because it was entitled to have spent 18 hours only on the run, and not 19 hours. It being thus unlawful to haul this car with chains, and the evidence without dispute showing that delays to the train between Cliffs and Winslow were caused by this car, it follows that such delays were not the result of casualty or unavoidable accident, and not within the proviso.

As any service beyond the 16 hours, which is not excused by the

proviso, is unlawful and forbidden by the act, a judgment for the plaintiff must follow.

As a result of these views, the jury are instructed to return a verdict for the defendant on the first three counts of the complaint, and for the plaintiff on the remaining counts.