**UNITED STATES of America, Plaintiff,**

v.

**The ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, Defendant.**

**No. C-73-0238.**

United States District Court, N. D. California.

Aug. 24, 1973.

As Amended Oct. 23, 1973.

David E. Parry, Los Angeles, Cal., for defendant.

## OPINION AND ORDER

SCHNACKE, District Judge.

This is an action by the United States pursuant to 45 U.S.C. § 64a(a) to recover the statutory penalty for violation of 45 U.S.C. § 62(a)(1), a part of the federal Hours of Service Act, 45 U.S.C. §§ 61–64b, *infra*. It is before the Court on cross-motions for summary judgment. The United Transportation Union and the Brotherhood of Locomotive Engineers have filed briefs *amicus curiae* in support of plaintiff's motion.

The facts are stipulated: Four employees of defendant went on duty on February 14, 1971, at Richmond, California. They operated one train from Richmond to Riverbank, California. After a short layover at Riverbank, not material here, they operated another train back to Richmond, where the round trip ended some sixteen hours later. Without more, continuous duty of this duration would clearly violate § 62(a)(1) and defendant would be liable for the statutory penalty of $500 per violation, $2,000 in this case.

However, the trip was interrupted for five hours and thirty-five minutes at Stockton, California, where the four men involved were released for this period and were free to do as they pleased, while continuing to be paid pursuant to collective bargaining agreement. Suitable facilities for food and lodging were available at Stockton if the men chose to avail themselves of them.

Richmond and Riverbank were specified as "home terminal" and "away-from-home terminal", respectively, under the collective bargaining agreement; Stockton was not.

Thus the ultimate question is whether Stockton qualified as a "designated terminal", § 61(b)(3)(A); if so, by necessary implication, it operated to interrupt the continuity of the period of service for more than four hours, § 61(b)(3)(B), the total thereby being less

Howard T. Chang, Asst. U. S. Atty., Dept. of Justice, San Francisco, Cal., for plaintiff.

than fourteen hours, and defendant did not violate § 62(a)(1) as charged.

The original Hours of Service Act was enacted in 1907, Act of March 4, 1907, c. 2939, 34 Stat. 1415, and remained without substantial amendment until the present amendments were adopted in 1969, P.L. 91–169, 83 Stat. 463. As originally enacted, it prohibited service "continuously" by a railroad employee for a period in excess of sixteen "consecutive" hours. Act of March 4, 1907, *supra*, § 3. A considerable body of case and administrative law had developed around the meaning of the expressions "consecutive" and "continuously", particularly as it pertained to layovers of the kind that occurred here at Stockton. Without going into the numerous decisions on this point, the situation may be summarized by saying that the courts and the Interstate Commerce Commission had established a rule of thumb to the effect that layovers of three hours or more at points where food and lodging were available were sufficient to interrupt the continuity of service and therefore should be excluded in calculating the sixteen "consecutive" hours permissible under the statute. However, the courts had never established a flat rule, but had emphasized that the problem was one to be resolved on the case-by-case basis.[1]

By 1969, it was thought to be fairly obvious that, by the mere passage of time and the changing attitudes toward hours of work and conditions of employment, some revision in the Hours of Service Act was in order. It seems apparent that the principal purpose of the amendments considered and adopted in 1969, insofar as they relate to the present problem, was to reduce the previous sixteen-hour period, initially to fourteen hours and then, after a two-year interval, to twelve hours, as reflected in the amendment that is now § 62(a)(1). Incidentally, while they were at it, Congress also saw fit to enact provisions on layoff periods during a run which would override the rule just mentioned, and this is where the present difficulties arose.

In this respect the Committees pursued a dual objective: First, to lengthen the three-hour layover time to four hours and, secondly, to prescribe the locations at which such interrupting layovers would be recognized. Everyone, the courts included, had agreed that a stop in the wilds without opportunity for food and lodging did not afford an adequate opportunity for rest of train crews. The unions were not satisfied, however, with a criterion based on facilities available for food and lodging or with one predicated upon prior railroad practice, and therefore the draftsmen cast about for some more specific term of reference. Faced with conflicting positions of management and the FRA (which, as will be seen, sought some precise test) on one hand and the unions on the other, the Committees recommended, and Congress adopted, the expression "designated terminal", backing it into the present § 61(b)(3)(A) and (B).

Congress had been placed on notice by the Administrator of the Federal Railroad Administration that the quoted term, like others in the pending legislation, was vague and indefinite and was likely to "generate considerable litigation and result in conflicting court decisions." See hearings of Senate subcommittee on S.1938, Serial No. 91–31, p. 193 (1969). Further emphasizing this point, the Administrator stated "The bill does not provide any standard for *'designated terminals'* such as a requirement that it provide adequate facilities for meals, rest and relaxation nor does it indicate how and by whom a terminal is to

---

1. There is no dispute among the parties as to the pre-1969 situation. It likewise seems to be agreed that the instant case is one of first impression, and that there are no court decisions either before or after 1969 that go very far toward solving the problem presented here. For that reason, it is unnecessary to give any detailed analysis or citations in connection with the situation before the 1969 amendments.

be designated." (Emphasis in original.) [2] Despite this, the Committee saw fit to proclaim:

"The phrase 'designated terminals' in § 1(b)(3)(A) & (B) is intended to have that meaning commonly recognized in the railroad industry. The committee is advised that collective bargaining agreements provide a commonly understood definition for this term. As a minimum the committee intends that the term should mean generally a place where suitable food and lodging are available for employees." S.Rep. No. 91–604, p. 8, U. S.Code Cong. & Admin.News, 1969, p. 1640.

If the Committee was so advised, which is not at all clear from the testimony, it was so advised in error, from all that appears in its proceedings.

In support of the Committee's contention that collective bargaining agreements commonly employ the phrase, the United States Attorney and the Union have submitted a number of such agreements, as well as numerous references to the testimony before the House and Senate Committees. These almost conclusively establish that the accepted terminology in the industry is "home terminal" and "away-from-home terminal". The expression "designated terminal" occurs occasionally in these agreements, but in each instance it clearly means those designated in the particular agreement and not those commonly referred to as such in the industry. In other words, the term is used as the virtual equivalent of "terminals herein specified", that is to say, it is a cross-reference for purposes of a particular agreement, but certainly the agreements submitted do not establish any common use of the term in the industry except for the limited purpose just mentioned.

The various excerpts from the Committee hearings really undercut plaintiff's position. Faced with the term "designated terminals" at various points in the hearings, the representatives of both management and labor almost unconsciously, it would seem, lapsed away from this term into the familiar terms "home terminal" and "away-from-home terminal". Be that as it may, the expression is in the statute, and we must do the best we can with it. The FRA, familiar as it is with the details of railroad terminology, remains at a loss to expound the meaning of the expression, although a member of its staff, arguing for plaintiff here, assured the Court that its meaning was perfectly clear. In a release dated January 9, 1973, the FRA refers to numerous inquiries as to the meaning of the term and states its present inability to do more than refer to the Committee report, pending possible adoption of a clarifying rule, which has apparently never been done.

Since the legislative history is ambiguous, we heed Mr. Justice Frankfurter's advice and look to the statute. In so doing, we reject the unhappy tendency to treat commonly used words as words of art.[3]

It is stipulated that Stockton is and has long been a railroad terminal. It is a sizeable and substantial community and a center for land- and waterborne transportation. Ample facilities for food, lodging and even recreation are there. It satisfies every legitimate criterion founded upon the undoubted need of railroad employees to rest from their labors.

---

2. In view of what follows, we need not consider the interesting Constitutional question of delegation of power that would arise were we to follow the suggestion that the matter was left to be defined in private agreements or the question of how such a consequence could be squared with the oft-repeated proposition that the Act is for the protection of public safety.

3. Likewise, the "canons" of statutory construction are of no help. The present statute is both "remedial" and "penal", as are the statutes proscribing murder, rape and overtime parking. We also note that the single word "terminal" appears in § 64a(d), with the observation that that does not get us anywhere either.

■ Since Stockton is clearly a "terminal", we need not explore all the possible interpretations of the word "designated", just as we need not consider the status of every point on the map where a train may stop.

■ Here the Government is attempting to impose a serious sanction. It must therefore convince the Court that Stockton is *not* a "designated terminal". It suffices to say that it has not done so. If Congress intended to provide that Stockton and similar cities are not "designated" terminals, i. e., not appropriate for the purposes of the legislation, its message has not carried across to this Court.

*Plaintiff's motion for summary judgment is denied; defendant's motion for summary judgment is granted, and judgment will be entered for defendant. Counsel for defendant shall submit an appropriate form of judgment in accordance with the procedures set forth in L. R. 123(d).*