UNITED STATES of America,
Plaintiff-Appellant,

v.

The ATCHISON, TOPEKA AND
SANTA FE RAILWAY CO.,
Defendant-Appellee.

No. 74–1061.

United States Court of Appeals,
Ninth Circuit.

Nov. 10, 1975.

Howard T. Chang, Asst. U. S. Atty. (argued), and Paul J. Fitzpatrick, Asst. U. S. Atty. (argued), San Francisco, Cal., for plaintiff-appellant.

C. George Niebank, Jr., John P. Frestel, Frestel & Niebank (argued), Chicago, Ill., for defendant-appellee.

Lawrence M. Mann (argued), Bernstein, Alper, Schoene & Friedman, Washington, D. C., for amicus (UTU).

OPINION

Before DUNIWAY, ELY and WRIGHT, Circuit Judges.

DUNIWAY, Circuit Judge.

The United States sued the Santa Fe Railway under 45 U.S.C. § 64a(a) for

statutory penalties for violations of the railroad Hours of Service Act, 45 U.S.C. §§ 61–64b. The only question is what Congress meant when it used the term "designated terminal" in 45 U.S.C. § 61(b)(3). On cross-motions for summary judgment, the district court refused to impose the penalties and entered judgment for the Santa Fe. *United States v. Atchison, Topeka & Santa Fe Railway Co.*, N.D.Cal., 1973, 363 F.Supp. 644. The government appeals, and we reverse.

## I. *The Facts.*

The facts were stipulated. At 4:30 a. m. on February 14, 1971, the crew of Santa Fe's "Extra 3427 East" train went on duty at Richmond, California, the crew's "home terminal." The four crew members—an engineer, two brakemen, and a conductor—had all been off duty for at least 24 hours. At 4:55 a. m. "Extra 3427 East" and crew left Richmond for Riverbank, California, the crew's "away-from-home" terminal. About four hours later, at 8:50 a. m., they arrived at Mormon Yard, Stockton, California, a major switching point, and stopped there to permit the interchange of cars with connecting carriers. At 9:05 a. m. all four crewmen were released for rest at Stockton, where suitable facilities for food and lodging were available. The release period lasted 5 hours and 35 minutes, until the crew was recalled at 2:40 p. m.

Continuing as the crew of "Extra 3427 East," the same four men left Stockton at 4:05 p. m. and reached Riverbank, which is much smaller than Stockton, at 4:55 p. m. After a brief stop, they left Riverbank at 5:45 p. m. to return to Richmond as the crew of Santa Fe's "Extra 3354 West." Upon returning to

Richmond, the conductor and brakemen were relieved from duty at 8:20 p. m., and the engineer was relieved at 8:25 p. m. In all nearly sixteen hours had elapsed from the time the crew first reported for duty in the early morning until they were relieved that evening.

The crew members were represented by two labor organizations—the engineer by the Brotherhood of Locomotive Engineers, and the others by the United Transportation Union—both of which are *amici curiae* in this case. The rates of pay, rules and working conditions of the employees were and are subject to the terms of collective bargaining agreements negotiated between the Santa Fe and the unions.[1] Under the pertinent collective bargaining agreements, Richmond was the recognized "home" terminal and Riverbank the "away-from-home" terminal for the crew assignment in this case. Stockton was a recognized "home" or "away-from-home" terminal for some other Santa Fe crew assignments but not for this or any other crew assigned to the Richmond-Riverbank-Richmond run. Stockton is "an historical release point" for crews on this run, but was not designated or specified as such in any collective bargaining agreement, bulletin instruction, or formal notice.

## II. *The Issue.*

On the date in question, it was unlawful under 45 U.S.C. § 62(a)(1) for the Santa Fe to require or permit an employee to continue on duty for more than fourteen hours (now the limit is twelve hours) until the employees had at least ten consecutive hours off duty. With some indirection, 45 U.S.C. § 61(b)(3) excludes from the computation of time on duty any period of four or more hours

---

1. Under those agreements, grievance procedures were available to the employees for any alleged violations of agreed rates of pay, rules, or working conditions. No claims or grievances arising out of the February 14, 1971, Richmond-Riverbank-Richmond run were filed by any of the crew members. They were paid their full hourly or mileage rate of compensa- tion for the duration of their service on that day, including the period of release at Stockton. That the employees were fully paid and that they filed no grievances are facts which do not bear directly on the merits of the issue in this case. We recite them merely to place the dispute in context.

available for rest at a "designated terminal":

> Time on duty shall commence when an employee reports for duty and terminate when the employee is finally released from duty and shall include:
>
> (A) Interim period available for rest at other than a designated terminal;
>
> (B) Interim periods available for less than four hours rest at a designated terminal;
>
> .　　.　　.　　.　　.

The statute does not define "designated terminal," and we must decide whether Stockton was a "designated terminal" for the crew in this case.

The government argues that "designated terminal" means the "home" or "away-from-home" terminal for a particular crew assignment as designated in a collective bargaining agreement. Because Stockton was not so designated in this case, the government contends that the time spent there, though available for rest, must be included in computing the time that the crew was on duty. Accordingly, the government says that the crew was on duty for nearly sixteen hours in violation of the fourteen-hour limit and seeks to impose on the Santa Fe a $2,000 penalty ($500 for each employee) as prescribed by 45 U.S.C. § 64a(a).

The Santa Fe, on the other hand, argues that a "designated terminal" is "any 'terminal' like Stockton, California, which is 'designated' by railroad management as a release point for a train crew and which affords that crew adequate facilities for food and lodging." Appellee's Brief at 8. The railroad argues that, because Stockton has been established as a release point by "custom and practice," the 5 hours and 35 minutes spent there do not count as time on duty. Thus the Santa Fe's position is that the crew was on duty for only 10 hours and 20 minutes—well under the fourteen-hour limit.

The district court agreed with the Santa Fe and held that the government had failed to "convince the Court that Stockton is *not* a 'designated terminal.'" 363 F.Supp. at 648 (emphasis by the district court). However, for the reasons discussed below, the government has convinced us.

### III. The Meaning of "Designated Terminal."

#### A. The Legislative History.

The Congress introduced the term "designated terminal" into section 1(b)(3) of the Hours of Service Act, 45 U.S.C. § 61(b)(3), by the Act of December 26, 1969, P.L. 91–169, 83 Stat. 463, which was designed to bring the safety provisions of the Hours of Service Act, originally enacted in 1907, up to date. While these 1969 amendments to the Act were under consideration, the Congress was amply forewarned that "designated terminal" would prove to be a troublesome term unless it was specifically defined. Reginald Whitman, then Administrator of the Federal Railroad Administration, Department of Transportation, told a Senate subcommittee:

> Section 1(b)(3) is new. It defines "time on duty" but in so doing adds new undefined terms to the Hours of Service Law which could generate considerable litigation and result in conflicting court decisions.
>
> The term *"designated terminal"* is one case in point. The bill does not provide any standard for *"designated terminals"* such as a requirement that it provide adequate facilities for meals, rest and relaxation nor does it indicate how and by whom a terminal is to be designated. . . .
>
> *Hearings on S. 1938 Before the Subcomm. on Surface Transportation of the Comm. on Commerce,* 91st Cong., 1st Sess. 193 (1969) (emphasis in original).

Mr. Whitman's testimony before a House committee considering a parallel bill was similar. *Hearings on H.R. 8449 Before the House Comm. on Interstate and Foreign Commerce,* 91st Cong., 1st Sess. 266 (1969). Had the Congress heeded these

warnings and provided its own lexicon, this case would not be here. The Congress did not and so, as happens all too often, we are the Congress' lexicographers by default.

While the legislative history is not so clear as the government asserts, it does provide us with a crucial clue to the etymology of the cryptic term. With respect to the "time on duty" provisions of the 1969 legislation, the Senate Committee on Commerce reported:

The phrase "designated terminals" in section 1(b)(3)(A) and (B) is intended to have that meaning commonly recognized in the railroad industry. The committee is advised that collective bargaining agreements provide a commonly understood definition for this term. As a minimum the committee intends that the term should mean generally a place where suitable food and lodging are available for employees.

*S.Rep.No.91–604,* 91st Cong., 1st Sess., 1969 U.S.Code Cong. & Admin.News pp. 1636, 1640.

Thus we know at least that Congress used "designated terminal" with the understanding that collective bargaining agreements would give that term meaning.

It is apparent from the Senate hearings on the 1969 legislation that Congress was so informed by R. R. Manion—then Vice President, Operations and Maintenance Department, Association of American Railroads, and chief spokesman for the railroads in opposition to the legislation—in a statement presented to a Senate subcommittee:

The pending bills provide that interim periods available for rest shall be counted as time on duty except those lasting 4 or more hours at what are referred to as "designated terminals." The term "interim period available for rest" is not defined, nor is the term "designated terminal."

· · · · ·

The term "designated terminal" is used in the bills to identify the kind of place at which interim periods of appropriate length may be excluded from duty time and is distinguished from "other than designated terminals" where all interim periods for rest are counted as time on duty.

*The term has significance in relation to the provisions of collective bargaining agreements and refers to terminals that are "designated" in such agreements.* It does not determine the question whether a given place is one at which suitable rest can be obtained.

Our view is that any place where reasonable facilities for food and rest are available to employees should qualify as the kind of place at which interim rest periods—of suitable length—should not count as time on duty. This concept should be substituted for the technical term "designated terminal." Food and rest are the essential physical requirements for a meaningful rest period, and they may well be obtainable at places that are not "designated" in collective bargaining agreements.

*Hearings on S. 1938, supra,* at 122–23 and 138 (emphasis supplied).

This testimony does much to illuminate the terse, and perhaps somewhat misleading, explanation of "designated terminals" in the Commerce Committee report.

*First,* we note that Mr. Manion said that certain terminals are *designated* (*i. e.,* specified or identified—see note 2 *infra*) in collective bargaining agreements—not, as the committee report might be read to suggest, that such agreements contain a universal description or dictionary-style definition of a "designated terminal," or that such agreements label certain places as "designated." As the district court below observed, 363 F.Supp. at 647, the terminals which collective bargaining agreements commonly designate are the "home terminal" and the "away-from-home terminal" for each crew assignment. Sometimes the terminals so designated are indeed labelled as "designat

ed" terminals. *Id.* Indeed, the pertinent collective bargaining agreements of the Santa Fe use these terms in this way. We think that this designation process, effected by collective bargaining agreement, must be the referent of the statutory shorthand "designated terminal."

Subsequent comments by Mr. Manion bolster our conclusion. Discussing other provisions of the proposed hours of service legislation, he stated:

In addition, the bills as drawn would apply the provisions of section 1, which relate to interim rest periods and deadhead transportation, to telegraphers and dispatchers as well as to railroad operating employees. There is no reason to do this because telegraphers, train dispatchers, and similar employees work at stationary places and those provisions do not properly pertain to them. Those employees do not have "designated terminals" or work from a home terminal to any away-from-home terminal, as operating employees do.

*Hearing on S. 1938, supra,* at 123. Although "designated terminal," "home terminal," and "away-from-home terminal" were all used loosely throughout the hearings and debates in 1969, this comment ties them together and indicates that the "home" and "away-from-home" terminals were the "designated terminals" Congress had in mind.

To dispute what seems to be the import of the Commerce Committee report, read in light of Mr. Manion's testimony, the Santa Fe relies on what it claims is a supplementary set of stipulated facts. Those facts were stipulated, before the institution of this action, between the Santa Fe and attorneys of the Federal Railroad Administration ("FRA"), the division of the Department of Transportation charged with administration of the Hours of Service Act. *See* 45 U.S.C. §§ 64a(b), 64b. However, the United States Attorney, charged under 45 U.S.C. § 64a(a) with litigating Hours of Service Act enforcement actions, never agreed to the supplementary facts. Whether the United States Attorney is bound by the "FRA stipulation" is a novel question which troubles us, but it is one we need not decide.

Assuming *arguendo* that the "FRA stipulation" was binding, we conclude that it does not help the Santa Fe. Paragraph 11, on which the Santa Fe primarily relies, states in part:

11. The phrase "designated terminal" was not one of art in common usage in the railroad industry when it was used by Congress in 1969 in enacting 45 U.S.C. § 61. Nor has it become such in the interim inasmuch as the railroad industry (railroad management), railroad labor and the Federal Railroad Administration on behalf of the public generally do not agree as to its meaning. . . .

That "designated terminal" was not a term of art in common usage in the railroad industry is not determinative, however.

What matters in our view is what collective bargaining agreements, which formed the backdrop against which the legislation was enacted, say. In that connection, paragraph 12 of the "FRA stipulation" states:

12. The collective bargaining agreements between Santa Fe and each of the labor organizations representing those crafts or classes of employees whose work involves them in the actual operation of trains use the phrase "designated terminal" in one instance in each of the said agreements. Such agreements do, however, contain a number of references to "designated home terminal" and "away-from-home terminal." Members of the Washington staff of the Federal Railroad Administration, Office of Chief Counsel and Office of Safety, have reviewed numerous collective bargaining agreements. They have found in agreements in force on other railroads some references to "designated terminal" and "away-

from-home terminal," and many references to "designated home terminal." Thus, even the "FRA stipulation" recognizes that the terminals designated, and sometimes expressly labelled as "designated," in collective bargaining agreements are the "home" and "away-from-home" terminals.

*Second,* we note that Mr. Manion supplemented his comments and criticisms by proposing on behalf of the railroads specific amendments to the then pending bill. *Hearings on S. 1938, supra,* at 127–28. By one such amendment the railroads would have substituted for the words "designated terminal" that now appear in 43 U.S.C. § 61(b)(3) the words "place where reasonable facilities for food and rest are available to employees." *Id.* at 153.[2] That Congress did not adopt this proposal indicates that Congress rejected the notion that any place with a coffee shop and motel or something similar would serve as a suitable rest stop.

■ The definition of "designated terminal" which the Santa Fe now urges is virtually the same as that which Congress rejected—except that the Santa Fe adds two new elements: (1) that the place having adequate facilities also be a "terminal" and (2) that it be "designated" in some way by railroad management. Neither additional element makes any difference. In railroad parlance, the word "terminal" has reference to a particular crew and run. *United States v. Atchison, Topeka & Santa Fe Railway Co.,* D.Ariz., 1914, 212 F. 1000, 1007. *See also Atchison, Topeka & Santa Fe Rail-*

*road Co. v. United States,* 1917, 244 U.S. 336, 341–42, 37 S.Ct. 635, 61 L.Ed. 1175 (stipulated fact). We think, therefore, that § 61(b)(3) refers to the "terminals" which are designated for the particular crew and run involved. The Santa Fe has advanced no reasons, and we can think of none, why a stop at any place with minimum facilities would be any more conducive to rest just because it happened to be a "terminal" for other trains and other crews. And certainly to add that the place must be unilaterally designated by management would be to require a pointless formality. We think that Congress must have intended to require a bilateral designation process.

Moreover, it was not superfluous, as the Santa Fe seems to argue, for the Senate committee to state the minimum food and lodging requirements if it meant to require more. It may be that some "home" and "away-from-home" terminals designated in collective bargaining agreements do not meet even those minimum requirements. It would therefore be reasonable for Congress to require both that release points be contractually established and that they have adequate food and lodging facilities. We think that is what Congress did.

### B. *Policy Considerations.*

The Santa Fe argues that the government's construction of "designated terminal" will impose substantial costs on railroad operations without significantly promoting safety. But we note that the railroads made similar arguments to Congress in generally opposing the 1969 amendments to the Hours of Service

---

2. The stated reasons for this proposed amendment echoed Mr. Manion's testimony:

There is need to define the kind of place at which a rest period of proper duration will not be counted as time on duty.

Setting aside the question of how long a rest period should last, it would seem that any place where the essential physical requirements for a meaningful rest period are available will meet the demands of the law. Those requirements are reasonable facilities for food and rest for employees. Such facilities should be adequate and genuine.

The term "designated terminal" has significance in relation to the provisions of collec-

tive bargaining agreements. It refers to certain terminals that are so *identified* in such agreements. It does not determine the question whether a given place is one at which suitable rest can be obtained. It is quite possible that reasonable facilities for food and rest are obtainable at places other than terminals that are "designated" in labor agreements. If so, rest periods of appropriate length at those places should be excluded from time on duty for hours of service purposes.

*Hearings on S. 1938, supra,* at 153 (emphasis supplied).

Act. *See, e. g., Hearings on S. 1938, supra,* at 13, 109, 119–20, 123–25, 160, 211, 220; *Hearings on H.R. 8449, supra,* at 128–35, 183–84, 201–05, 245; 115 *Cong.Rec.* 29318–20 (1969). We can only conclude that Congress weighed the railroads' arguments and found them wanting.

We are guided here by the Supreme Court's admonition in *Atchison, Topeka & Santa Fe Railway Co. v. United States, supra,* 244 U.S. at 343, 37 S.Ct. at 637, that "[the Hours of Service Act] is remedial and in the public interest, and should be construed in light of its humane purpose." Accordingly, we think that Congress could sensibly have concluded that rest periods best serve their function at a known location at the midpoint of a run where the crew has its established "away-from-home" terminal or at the end of a run where the crew has its established "home" terminal.

The facts of this case are illustrative. The crewmen were awakened at a very early hour; they were on duty for only about four and one-half hours before they were released for "rest"—if any they needed then. After being "off" for about five and a half hours, they were "on" again for almost six straight hours. It would not surprise us if at the end of their sixteen hour day the crewmen were fatigued and their abilities to perform their duties impaired. *See id.* at 342, 37 S.Ct. 635.

Worse, under the Santa Fe's view, it could presumably even reverse this run as follows: start from Riverbank towards Richmond; stop at Stockton for switching; continue to Richmond; turn around; and immediately return to Riverbank. Conceivably then the crew would be required to work one pre-dawn hour (Riverbank to Stockton); rest four hours at Stockton—if they could get meaningful rest under those circumstances; and then work up to eleven[3]

hours straight (Stockton to Richmond to Riverbank). Such potential for fatigue and the consequent safety hazard are what the Hours of Safety Act was intended to eliminate. *Id.* at 343.

We think that the safety hazards would be mitigated by requiring that stops which toll the running of time on duty be made only at a crew's contractually established, i. e., "designated," "home" or "away-from-home" terminals. There the crewmen will presumably be in familiar surroundings and can establish regular accommodations for rest. Moreover, rest stops will presumably be spaced more evenly and effectively to break up monotonous long runs.

If, given established routes, this requirement is impractical, the railroads and unions are free to renegotiate "home" and "away-from-home" terminal designations. Indeed, railroads and unions may also be free to establish "designated terminals" for purposes of the Hours of Service Act at places other than the "home" and "away-from-home" terminals designated for other collective bargaining purposes. *Cf.* 45 U.S.C. § 64 (declaring that hours of service shorter than the statutory maximum are proper subjects of collective bargaining). That question we need not decide here because Stockton was neither the crew's "home" nor its "away-from-home" terminal nor was it otherwise designated by collective bargaining machinery as a release point for this crew. On this record, we decline to go further than necessary to decide this case.

## IV. *Conclusion.*

■■ We hold that the term "designated terminal" as used in the Hours of Service Act, 45 U.S.C. § 61(b)(3), refers to terminals designated in or under collective bargaining agreements. Because Stockton was not so designated for the instant crew, the layover at Stockton should have been counted as time on

---

**3.** By making it unlawful to require or permit an employee "to continue on duty or to go on duty when he has not had at least eight consecutive hours off duty during the preceding twenty-four hours," 45 U.S.C. § 62(a)(2) appears to limit the elapsed time from going on duty to going off in this hypothetical example to sixteen hours (one hour on, four off, plus eleven on).

duty. The Santa Fe therefore violated the Hours of Service Act.

The judgment is reversed and the case is remanded with directions to enter a judgment for the United States.

EUGENE A. WRIGHT, Circuit Judge (dissenting):

With due respect, I dissent and would adopt the language of the district court:

Here the Government is attempting to impose a serious sanction. It must therefore convince the Court that Stockton is *not* a "designated terminal". It suffices to say that it has not done so. If Congress intended to provide that Stockton and similar cities are not "designated" terminals, i. e., not appropriate for the purposes of the legislation, its message has not carried across to this Court.

*United States v. Atchison, Topeka & Santa Fe Railway Co.,* 363 F.Supp. 644, 648 (N.D.Cal.1973).

I would hold that any Santa Fe terminal as defined in the collective bargaining agreement which meets the minimum food and lodging standards is a designated terminal for the purposes of this Act unless the relevant collective bargaining agreement specifically excludes it.

The majority observes, Note 1, that grievance procedures were available to the train crew, that they were paid for the run in question and for the time spent in Stockton, and that they made no complaint and filed no grievance. I disagree with the conclusion that these "are facts which do not bear directly on the merits of the issue in this case." Rather, they convince me that the interpretation of the term "designated terminal," as applied to a specific run, should be left to the collective bargaining process.

There are times when a court should look to ways in which persons have reacted in response to a statute as an aid to interpreting the statute's meaning. The analysis used by the late Professor Henry Hart and Professor [now Dean] Albert Sacks of Harvard Law School in interpreting the terms "work," "workweek," and "working time" for purposes of the Fair Labor Standards Act of 1938 [29 U.S.C. § 201 *et seq.*] can be applied to the case at bar.

Evidence of the common understanding of the terms "work" or "working time" or "workweek" [or designated terminal] might be thought to be relevant for two reasons: first, as a showing, at the least, that the words would bear the meaning reflected in the understanding; and second, as showing, on the basis of the assumption that the legislature used the words in their ordinary signification to the people affected, that this meaning was the correct one.

H. M. Hart and A. Sacks, The Legal Process: Basic Problems in the Making and Application of Law, 1299 (tent. ed. 1958). The fact that no grievance was filed indicates that those affected did not find Stockton unacceptable or a breach of the collective bargaining agreement which regulates the designated terminals.

The majority's reliance on testimony before a Congressional committee, in determining Congressional intent, is misplaced. As noted by the district court, the testimony is ambiguous. In the absence of a clear expression of legislative intent, I would look to the purpose of the statute to find the meaning of "designated terminal."

The plain language of § 64 demonstrates why a broad definition of the term should be favored. It reads:

The requirements imposed by sections 61 to 64b of this title with respect to time on duty of employees are hereby declared to result in the maximum permissible hours of service consistent with safety. However, shorter hours of service and time on duty of employees for lesser periods of time are hereby declared to be proper subjects for collective bargaining between any common carrier subject to sections 61 to 64b of this title and its employees. 45 U.S.C. § 64.

If Stockton could be considered as a designated terminal for purposes of the Hours of Service Act,[1] then Section 64 would seem to place the burden of bargaining on the unions to determine that Stockton is not so designated.

The primary purpose of the Hours of Service Act is to provide minimum standards to insure safety. Congress appears also to have intended to encourage both railroads and unions to bargain above these minimums. The majority position interferes with the bargaining by setting a status quo ante which is above the implied minimum standards. I do not read the statute to go so far.

I would affirm the district court's judgment on the basis that Stockton was a designated terminal within the broad definition.

---

1. Using the majority's definition it is possible for the railroad to accomplish the dire result which the majority relates at page 1190 without violating the Act. Riverbank would be the home terminal and Stockton and Richmond would be away-from-home terminals for this crew. It seems clear that the Hours of Service Act will permit the railroad to take its employees away from their homes for up to 16 hours per day, e. g., 12 hours on duty [45 U.S.C. § 62(a)(1)], 4 hours off at a designated terminal [45 U.S.C. §§ 61(b)(3) A, B], and 8 hours at home [45 U.S.C. § 62(a)(2)].