ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY *v.* UNITED STATES.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE NINTH CIRCUIT.

No. 267.　Argued May 4, 1917.—Decided June 4, 1917.

The Hours of Service Act of March 4, 1907, 34 Stat. 1415, is remedial, passed to protect both public and employees from the dangers arising from overwork in railway employment, and should be construed, in effectuation of this purpose, as requiring the carrier to do all reasonably within its power to confine the hours of service within the limits stated.

It was the intention of the proviso in § 3, not to relieve the carrier from a diligent effort to avoid exceeding the limits of service which the act specifies, but only to afford relief in cases where service beyond those limits is necessarily entailed by the causes mentioned in the proviso.

If, as the result of delay due to unavoidable accident, a train crew will not be able to take the train to the terminal of their normal run without serving beyond the time limit prescribed by the act, it becomes the carrier's duty to prevent such excessive service by substituting a fresh crew whenever, in the exercise of all reasonable diligence, it is able to do so.

220 Fed. Rep. 748, affirmed.

THE case is stated in the opinion.

*Mr. Paul Burks,* with whom *Mr. Robert Dunlap, Mr. E. W. Camp* and *Mr. Gardiner Lathrop* were on the brief, for plaintiff in error.

*Mr. Assistant Attorney General Underwood,* with whom *Mr. Alex Koplin* was on the brief, for the United States.

MR. JUSTICE DAY delivered the opinion of the court.

The United States brought an action in the District Court of the United States for the Southern District of California, Southern Division, against the Atchison, Topeka & Santa Fe Railway Company, to recover the sum of $1500 for three alleged violations of the Hours of Service Act of March 4, 1907, 34 Stat. 1415, 1416, the relevant parts of which are as follows:

"Sec. 2. That it shall be unlawful for any common carrier, its officers or agents, subject to this Act to require or permit any employee subject to this Act to be or remain on duty for a longer period than sixteen consecutive hours, and whenever any such employee of such common carrier shall have been continuously on duty for sixteen hours he shall be relieved and not required or permitted again to go on duty until he has had at least ten consecutive

hours off duty; and no such employee who has been on duty sixteen hours in the aggregate in any twenty-four-hour period shall be required or permitted to continue or again go on duty without having had at least eight consecutive hours off duty:   .   .   .

"Sec. 3.   .   .   .   *Provided,* That the provisions of this Act shall not apply in any case of casualty or unavoidable accident or the act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employee at the time said employee left a terminal, and which could not have been foreseen.   .   .   ."

From the stipulated facts the following appears: That the Atchison, Topeka and Santa Fe Railway Company is a corporation duly organized and existing under the laws of Kansas, and was at the times mentioned in the complaint a common carrier engaged in interstate commerce by rail. That at the times mentioned in the petition this railway company operated a certain interstate passenger train from Los Angeles, California, to Phoenix, Arizona, known as train No. 18, and a similar train from Phoenix to Los Angeles known as train No. 17. That this latter train customarily, and on the dates in question, moved from Phoenix to Parker, Arizona, in charge of train and engine crews, which crews were changed at Parker, where there was attached to the train an engine in charge of a crew which ran from Parker to Barstow, California, a distance of 183.5 miles. That at Parker train No. 17 was taken in charge of and handled from that point to Los Angeles, a distance of 335.3 miles, by a passenger train crew, consisting of a conductor and two brakemen, who were the employees of the railroad company mentioned in the complaint.

That the terminals for the passenger train crews engaged in the operation of trains Nos. 17 and 18 are Los Angeles and Parker. That the employees described in

the complaint resided and had their homes in Los Angeles, from which point they customarily left for Parker in charge of train No. 18, which arrived at Parker at or about 1:15 o'clock A. M., whereupon they were relieved until 10:40 o'clock P. M., on the same day.  That during the interval they were permitted to enjoy the accommodations for rest at Parker, which was their "away-from-home-terminal."  That at 10:40 o'clock P. M. they reported for the return trip to Los Angeles on train No. 17, and customarily reached Los Angeles at or about 10:15 o'clock A. M. on the next day, from which time until 10:30 o'clock P. M. on the following day they were not on duty, and during that time they were permitted to repair to and remain at their respective homes in Los Angeles, which was their "home-terminal."

That on October 2nd and 3rd, 1912, passenger train No. 17 was operated between Parker and Los Angeles by the employees named in the complaint, and that they were compelled to be and remain on duty in connection with the movement of that train from 10:40 o'clock P. M. on October 2nd, until 8:25 o'clock P. M. on October 3rd, under the circumstances hereinafter set forth.

That the employees named reported for duty at Parker, at 10:40 o'clock P. M. on October 2nd, and at 11:10 o'clock P. M. departed from Parker in charge of train No. 17, which arrived at Barstow, California, at 7:10 o'clock A. M. on October 3rd, having been delayed for a period of two hours and thirty minutes on account of washouts, the cause of this delay not being known to the defendant, or to any of its officers or agents in charge of the employees at the time they left Parker, and incapable of being foreseen.  That train No. 17 was scheduled to leave Barstow at 4:45 o'clock A. M. on October 3rd, but by reason of the delay in reaching Barstow it actually left that point at 7:45 o'clock A. M., with ample time then remaining to reach Los Angeles within less than sixteen hours after

the conductor and brakemen entered upon their service, but at 8:30 o'clock and while the train was being operated between Barstow and San Bernardino, California, an axle broke under the tank of the engine, whereby the movement of the train was necessarily and unavoidably delayed for a period of six hours and ten minutes, with the result that instead of reaching San Bernardino at 7:35 o'clock A. M., according to its usual schedule, or at 10:35 o'clock A. M., as it would have done but for the delays in reaching and leaving Barstow, it actually arrived at San Bernardino at 5:30 o'clock P. M., and that instead of reaching Los Angeles at 10:15 o'clock A. M., in accordance with its usual schedule, or at 1:16 o'clock P. M., as it would have done but for the delays in reaching and leaving Barstow had there been no further delays, it actually reached Los Angeles at 8:25 o'clock P. M. on October 3rd, the employees having been on duty for twenty-one hours and forty-five minutes. That the breaking of the axle whereby the train was delayed for six hours and ten minutes was a casualty and an unavoidable accident, and the delay to the train caused thereby was the result of causes not known to defendant, or to any of its officers or agents in charge at the time the employees left Parker, and which could not have been foreseen.

That train No. 17, after having been delayed in reaching and leaving Barstow, and after having been delayed six hours and ten minutes by the broken axle, proceeded to Los Angeles in charge of the employees who were in charge when it left Parker, and that in going to Los Angeles the train and employees passed through the station of San Bernardino, California, which is a point known and designated as a division terminal, and which was a place appointed and customarily used as a terminal from and to which crews of certain other passenger and freight trains of the defendant brought their trains, but which was not a terminal for train crews in charge of trains Nos. 17 and 18

or of any other trains operating between Parker and Los Angeles. That at and previous to the time the employees in charge of train No. 17 had been continuously on duty for a period of sixteen hours, defendant had in its employ at Los Angeles and also at San Bernardino passenger, train crews which were customarily assigned to other passenger trains, and crews which were subject to call which were customarily used in operating freight trains, who were qualified should necessity require to operate passenger trains between San Bernardino and Los Angeles. That the employees in charge of train No. 17 could have been relieved at San Bernardino and the train placed in charge of one of such other freight or passenger train crews at a time which would have permitted the employees in charge of train No. 17, to "deadhead" from San Bernardino to Los Angeles on that train without performing any service.

That before the delay of six hours and ten minutes which resulted from the broken axle had expired, and before the damage which had caused such delay had been repaired, and before the train left the point where the damage occurred, it was known to the defendant and its officers and agents that such employees would have been on duty in excess of sixteen hours by the time they reached San Bernardino, but that no effort was made to relieve them before they had been on duty continuously in excess of sixteen hours, either previous to or at the time of their arrival at San Bernardino, or at any time before they reached Los Angeles.

That it is commonly understood by railroad men with a knowledge of the practical operation of trains that the word "terminal" has reference to certain train or trains or certain crew or crews, and means the beginning or the end of the employee's run or the point at which in the regular course of business he would go on duty as a member of a particular crew, or at which in the regular course

of business he would cease to be a member of such crew of a particular train and be relieved from duty.

Judgment was rendered in the sum of $100 upon each cause of action against the railroad company. Upon proceedings in error, this judgment was affirmed by the United States Circuit Court of Appeals for the Ninth Circuit (220 Fed. Rep. 748), and a writ of certiorari brings the case here.

It is the contention of the railroad company that the detention in service beyond the period prescribed by the statute being due to an unavoidable accident, the limitation of the statute for that trip was at an end and the company was not liable for the penalty imposed because of the extra service required upon that trip. On the other hand, the Government insists that in view of the prime purpose of the statute to limit the hours of service so as to keep within the time prescribed, and not to subject the men to service beyond these hours, it was the company's duty to relieve the crew at San Bernardino by supplying their places with others instead of keeping them on duty to Los Angeles, thereby requiring service in excess of that permitted by the statute.

Considering these opposing contentions, it must be remembered that the purpose of the act was to prevent the dangers which must necessarily arise to the employee and to the public from continuing men in a dangerous and hazardous business for periods so long as to render them unfit to give that service which is essential to the protection of themselves and those entrusted to their care. It is common knowledge that the enactment of this legislation was induced by reason of the many casualties in railroad transportation which resulted from requiring the discharge of arduous duties by tired and exhausted men whose power of service and energy had been so weakened by overwork as to render them inattentive to duty or incapable of discharging the responsible labors of their positions.

To promote the end in view, so essential to public and private welfare, Congress, in this Hours of Service Act, provided the limitations named upon the hours of service. The act is remedial and in the public interest, and should be construed in the light of its humane purpose.   Congress also realized that it might be impracticable in all cases to keep the employment within the hours fixed in the act, and added a proviso to relieve from the general application of the requirements of the law so that it might not apply when the employment beyond the periods named was caused by casualty or unavoidable accident or the act of God, or where the delay was the result of a cause not known to the carrier or its officer or agent at the time the employee left a terminal, and which could not have been foreseen. .

It was not the intention of the proviso, as we read it, to relieve the carrier from the exercise of diligence to comply with the general provisions of the act, but only to relieve it from accidents arising from unknown causes which necessarily entailed overtime employment and service. *United States* v. *Dickson*, 15 Pet. 141.   It is still the duty of the carrier to do all reasonably within its power to limit the hours of service in accordance with the requirements of the law.

Applying this view to the present case, it was the duty of the company, after the breakdown between Barstow and San Bernardino, to use all reasonable diligence to avoid the consequences of the unavoidable accidents which had delayed the movement of the train and to relieve the crew by the means practically at hand.   This the company might have done by putting on a relief crew at San Bernardino instead of permitting an already exhausted crew, when their condition is judged by the service performed, to hazard their own lives and safety as well as the safety of others by continuing the journey to Los Angeles.

The requirement of continued service after the train reached San Bernardino was not occasioned by the unforeseen accidents, but was the direct consequence of the failure of the company to relieve the employees by the substitution of a fresh crew, as the record shows could readily have been done.

It is contended by the company that this construction of the statute is opposed to that given by the Interstate Commerce Commission, the body entrusted by Congress with the enforcement of the act, and is against the understanding of the law which the Commission had given the company to believe would be enforced.

It appears that two constructions of the act have been given by the Interstate Commerce Commission; one on March 16, 1908, as follows:

"The instances in which the act will not apply include only such occurrences as could not be guarded against; those which involved no neglect or lack of precaution on the part of the carrier, its agents, or officers; and they serve to waive the application of the law to employees on trains only until such employees, so delayed, reach a terminal or relay point."

This construction would plainly require the railroad company to have substituted a new crew at San Bernardino and not to require the further service to Los Angeles. The other construction, and the one which the company contends should be controlling, was given later, on May 24, 1908, and is as follows:

"Section 3 of the law provides that: 'The provisions of this Act shall not apply in any case of casualty or unavoidable accident or act of God; nor where the delay was the result of a cause not known to the carrier or its officer or agent in charge of such employee at the time said employee left a terminal, and which could not have been foreseen.'

"Any employee so delayed may therefore continue on

duty to the terminal or end of that run. The proviso removes the application of the law to that trip. (See Rule 287.)"

These possibly diverse rulings of the Commission were rescinded on April 9, 1917, by the following order of the Commission:

"Conference Rulings 88 (b) and 287 (i), relating to the Hours-of-Service-Law, rescinded, for the reason that they were issued as informal expressions of the Commission's views to act as guides until the questions could be judicially interpreted, and they having been judicially interpreted and are now before the court on appeal there is no further occasion for these former views of the Commission."

If the construction contended for by the company be adopted, it would follow that the employees might be kept in service for indefinite periods, until the termination or end of the run should be reached, which it is not difficult to suppose might require many hours of service beyond the limitations prescribed in the body of the act. This construction would defeat the purpose of the act by permitting the employees to endanger themselves and the public by the continued service of tired and exhausted men. We reach the conclusion that in keeping the crew in service beyond San Bernardino the Company was guilty of a violation of the statute.

We find no error in the judgment of the Circuit Court of Appeals, and the same is

*Affirmed.*

MR. JUSTICE MCREYNOLDS took no part in the consideration or decision of this case.