## CHICAGO & NORTHWESTERN RAILWAY COM-PANY *v.* UNITED STATES.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SEVENTH CIRCUIT.

No. 250. Argued March 27, 28, 1918.—Decided April 15, 1918.

The "28 Hour Law," forbidding interstate railroads from confining animals in cars beyond a certain period without unloading them for rest, water and feeding, unless prevented by accidental or unavoid-able causes which cannot be anticipated or avoided by the exercise of due diligence and foresight, and subjecting every such carrier who knowingly and wilfully fails to comply therewith to a penalty, must be construed with a view to carrying out its humanitarian purpose, but the exception in favor of the carrier must be given proper latitude and enforced in the light of practical railroad con-ditions.

If, in the exercise of ordinary care, prudence and foresight, the carrier reasonably expects that, following the determined schedule, the containing car will reach destination, or some unloading place, within the prescribed time, it properly may be put in transit. Thereafter, the duty is on the carrier to exercise the diligence and foresight which prudent men, experienced in such matters, would adopt, to prevent accidents and delays and to overcome the effect of any which may happen, with an honest purpose always to secure unloading within the lawful period. If, notwithstanding all this, unloading is ac-tually prevented by storm or accident the reasonable delay must be excused.

234 Fed. Rep. 268, reversed.

THE case is stated in the opinion.

Mr. *Charles A. Vilas,* with whom Mr. *William G. Wheeler* was on the brief, for petitioner.

Mr. *Assistant Attorney General Frierson,* with whom Mr. *S. Milton Simpson* was on the brief, for the United States:

There was excess confinement of 3 hours and 5 minutes. The claim is that there should be deducted from the

actual time 3 hours and 20 minutes of unavoidable delay, leaving the carrier 15 minutes to the good. The fact that there has been an unavoidable delay does not afford exemption if it appears that notwithstanding such delay the carrier could, by proper foresight and diligence, have unloaded within the required time. *Atchison, Topeka & Santa Fe Ry. Co.* v. *United States,* 244 U. S. 336; *Newport News &c.* v. *United States,* 61 Fed. Rep. 480, 490.

The full 3 hours and 20 minutes cannot be counted as excusable delay because, first, at least an hour was inexcusably wasted, and second, at least 28 minutes of it consisted of loss from an accident of such common occurrence that it should have been anticipated. On the carrier's own theory, then, it has failed to account for from $\frac{3}{4}$ to $1\frac{1}{4}$ hours. There was evidence warranting the conclusion that, after the accident happened, the carrier needlessly consumed from an hour to $1\frac{1}{2}$ hours in making the rest of the trip. Under the circumstances, the confinement of the cattle for so long a time manifested that disregard of the law or indifference to its requirements which amounts to wilfulness within the meaning of the statute. This case, 234 Fed. Rep. 268, and cases cited; *Spurr* v. *United States,* 174 U. S. 728; *Armour Packing Co.* v. *United States,* 209 U. S. 56.

The exceptions are general and go to a portion of the charge which contains propositions of unquestioned correctness. They, therefore, cannot be considered. *Lincoln* v. *Claflin,* 7 Wall. 132, and other cases. But the portion excepted to is not erroneous.

The carrier was under the double duty to exercise such foresight in laying out and making its runs that, taking into consideration ordinary delays, it could reasonably expect to comply with the law and, after the occurrence of an unexpected delay, to use diligence to minimize the consequences of such delay. After the accident at Proviso, this carrier deliberately wasted at least an hour.

This itself is sufficient to warrant the verdict. In addition, the fair inference from such evidence as the carrier submitted was that 2 hours and 57 minutes actual running or, including 28 minutes resulting from such an accident as is always to be anticipated, 3 hours and 25 minutes, was an unreasonable time to be consumed in runni~ɕ 16 miles and showed a gross want of diligence. But it this inference was not warranted, and even if it appeared that there were conditions on account of which this much time was ordinarily required, the plight of the carrier would be no better. It would still be guilty of wasting an hour at Proviso. And it would be in the position of having exercised such poor foresight in running its train to Proviso as to leave only 3 hours and 12 minutes for a run which would, without even an ordinary accident, require 2 hours and 57 minutes, and which in the event of a drawbar pulling out, a thing always to be anticipated and which did occur, would require 3 hours and 25 minutes and result in a failure to comply with the statute. It would thus stand convicted of a want of both foresight and diligence.

MR. JUSTICE McREYNOLDS delivered the opinion of the court.

Charging violation of the Act of June 29, 190_, 34 Stat. 607, to prevent cruelty to animals while in transit, the United States sued petitioner for the prescribed penalty and recovered a judgment in the District Court, Northern District of Illinois, which the Circuit Court of Appeals affirmed. 234 Fed. Rep. 268.

The statute forbids an interstate railroad carrier from confining animals in cars longer than thirty-six hours, upon written request, without unloading them for rest, water and feeding "unless prevented by storm or by other accidental or unavoidable causes which can not be anticipated or avoided by the exercise of due diligence and

foresight;" and subjects every such carrier "who knowingly and willfully fails to comply" therewith to a penalty. Admitting continuous confinement for more than thirty-six hours petitioner defended upon the ground that it was prevented from unloading within the required period by exculpatory accidental and unavoidable causes.

It appeared: The animals were loaded at Ringsted, Iowa, four hundred and thirty-eight miles from destination,—Union Stock Yards, Chicago—at six P. M. October 4th, and as part of a train the car containing them left Clinton, Iowa, one hundred and thirty-eight miles from Chicago, at six P. M. October 5th. The ordinary schedule time between the latter points is nine hours, but without increase of actual moving speed the run had been made in about six. While the train was passing through Proviso, sixteen miles from destination, at 2:48 A. M. October 6th, a drawbar came out and derailed a car. A delay of two hours and fifty-two minutes followed—not undue the carrier contends, but unreasonably long the Government maintains. Later, at Brighton Park an air hose burst causing further delay of twenty-eight minutes. The car reached the stock yards at 9:05 A. M. October 6th—thirty-nine hours and five minutes after being loaded.

In its charge to the jury the trial court said:

"Your inquiry has to do with the transportation of this car of stock from the point of origin out in Iowa to destination, Union Stock Yards, and if, on the evidence in this case, you conclude that the Railway Company, by the exercise of due diligence, would have gotten and could have gotten that car of stock from the point of origin to Union Stock Yards inside of thirty-six hours, your verdict should be in favor of the United States and against the defendant, even though you should be of the opinion that these two particular things which have been made the subject of most of the contention here were properly handled by the Railway Company.

"Now, in determining this question you take into con-sideration the distance, among other things, the distance shown by the evidence from the point of origin to des-tination, what the evidence shows as to the period of time, thirty-nine hours and five minutes consumed from point of origin to destination, not merely from Clinton to Chicago, the whole movement is here for your consideration and to be considered by you in determining whether or not due diligence has been shown by the carrier.

"Now what is due diligence? Due diligence, as that term is used in this statute means the exercise of foresight bringing to bear on the situation in hand, the transaction in hand, the human intelligence of an average man em-ployed in such business and exercised by a man who has been experienced in railroad business, trained in railroad business so that he knows what should be done in the matter of handling railroads, operating railroads, moving cars,—not merely the movement of an engine, the han-dling of the throttle by an engineer, not merely the han-dling of the conductor's work, the brakeman's work or the division superintendent's work, but the whole thing involved in the transaction of operation of the railroad in so far as the movement of this train is concerned, and whatever ingenuity, that is to say whatever human intel-ligence could devise and put in operation, having in mind the practical operation of a railroad, and having in mind the purpose which the law has, to get stock to market within the time mentioned, having in mind the movement of trains, the keeping of a railroad open, what human in-genuity could devise, in so far as human intelligence goes, having the benefit of experience, in the way of safe guards and in the way of provision to get stock from origin to destination within the period of this statutory limit, the railroad company has to do. Of course it is not the law that a railway company may lay out a slow schedule over a long distance and then if just before they get in to desti-

nation something happens for which they were not prepared or equipped, merely because if that thing had not happened they might have skinned in within the thirty-six limit they are excused; that is not the law."

The statute must be construed with a view to carrying its humanitarian purpose into effect and the exception in favor of the carrier given proper latitude and enforced in the light of practical railroad conditions. Nothing indicates the running schedule was unduly slow; and the jury were improperly given to understand that, conceding matters were properly handled when accidents occurred at Proviso and Brighton Park, they might nevertheless decide the railroad could have got the car to destination within thirty-six hours if due diligence had been exercised in laying out such schedule. The definition of "due diligence" in the charge was too exacting and misleading. As applied to the facts due diligence did not require, as the court declared, that "whatever ingenuity, that is to say whatever human intelligence could devise and put in operation, having in mind the practical operation of a railroad, and having in mind the purpose which the law has, to get stock to market within the time mentioned, having in mind the movement of trains, the keeping of a railroad open, what human ingenuity could devise, in so far as human intelligence goes, having the benefit of experience, in the way of safe guards and in the way of provision to get stock from origin to destination within the period of this statutory limit, the railroad company has to do."

We find nothing in the act indicating a purpose to interfere directly with the carrier's discretion in establishing schedules for trains; the design was to fix a limit beyond which animals must not be confined, whatever the schedule, except under the extraordinary circumstances stated. In general, unloading can only take place at specially prepared places or final destination. If in the exercise of ordi-

nary care, prudence and foresight the carrier reasonably
expects that following the determined schedule the con-
taining car will reach destination or some unloading place
within the prescribed time it properly may be put in
transit. Thereafter the duty is on the carrier to exercise
the diligence and foresight which prudent men, experienced
in such matters, would adopt to prevent accidents and
delays and to overcome the effect of any which may hap-
pen—with an honest purpose always to secure unloading
within the lawful period. If, notwithstanding all this,
unloading is actually prevented by storm or accident the
reasonable delay must be excused.

In the Hours of Service Act, 34 Stat. 1415–1416, there
is a proviso "that the provisions of this Act shall not ap-
ply in any case of casualty or unavoidable accident or the
act of God; nor where the delay was the result of a cause
not known to the carrier or its officer or agent in charge
of such employee at the time said employee left a ter-
minal, and which could not have been foreseen. . . ."
Construing this, in *Atchison, Topeka & Santa Fe Ry. Co.
v. United States*, 244 U. S. 336, 343, we said: "It was not
the intention of the proviso, as we read it, to relieve the
carrier from the exercise of diligence to comply with the
general provisions of the act, but only to relieve it from
accidents arising from unknown causes which necessarily
entailed overtime employment and service. *United States
v. Dickson*, 15 Pet. 141. It is still the duty of the carrier
to do all reasonably within its power to limit the hours of
service in accordance with the requirements of the law."
This general principle should also be followed in constru-
ing and applying the provision of the statute here under
consideration.

The judgment below is reversed and the cause remanded
to the District Court for further proceedings in accordance
with this opinion.

*Reversed and remanded.*