UNITED STATES of America, Plaintiff,

v.

ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, Defendant.

No. 76–759 C(1).

United States District Court, E. D. Missouri, E. D.

May 3, 1977.

Barry A. Short, U.S. Atty., Joseph B. Moore, Asst. U.S. Atty., St. Louis, Mo., for plaintiff.

Donal L. Turkal, Donald E. Engle, John H. Haley, Jr., St. Louis, Mo., Lawrence M. Mann, Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEREDITH, Chief Judge.

This matter was tried to the Court on stipulation of facts, exhibits, and briefs. Both parties have filed cross-motions for summary judgment.

### Findings of Fact

1. This action was brought under the Hours of Service Act (hereinafter Act), 45 U.S.C. §§ 61 to 64b, inclusive, by the United States of America (hereinafter Government) against the St. Louis-San Francisco Railway Company (hereinafter Frisco), a Missouri corporation, which has offices and places of business in St. Louis, Missouri, seeking a $500 penalty for each of the four herein alleged violations of the Act, a total of two thousand dollars ($2,000), pursuant to 45 U.S.C. § 64a. Frisco was and is a common carrier by railroad, engaged in interstate commerce in the State of Missouri and elsewhere, and, as such, is subject to the Act and the jurisdiction of this Court. At all times the crew herein was engaged in the movement of property in interstate commerce.

2. At 6:00 a. m., on November 16, 1973, the crew of Frisco Train No. 822 (also known as Extra 909 North), a through train, reported for duty at its "home" terminal, namely, Chaffee, Missouri. The crew consisted of four men: J. T. Spencer, conductor; E. E. White and G. L. Crowder, brakemen; and W. N. Crank, engineer.

3. The train departed Chaffee at 8:00 a. m., for St. Louis, 138 miles north, a trip which is scheduled to be completed in five hours. St. Louis was the "away-from-home" terminal for this crew. The train arrived at Crystal City, Missouri, 105 miles north of Chaffee and 33 miles south of St. Louis, at 10:40 a. m. For reasons of railroad operating necessity as determined by Frisco management (St. Louis terminal could not accommodate the train and additional cars until space became available), all four crew members were released from duty at 11:45 a. m., at Crystal City, where adequate facilities for food and lodging were available to the crew. This release period extended from 11:45 a. m. until the crew was recalled to duty at 9:00 p. m., a period of nine hours and fifteen minutes. The four crew members departed Crystal City at 10:50 p. m. and arrived at their "away-from-home" terminal, Lindenwood Yard, St. Louis Missouri, at 1:25 a. m., on November 17, 1973, a total of nineteen hours and twenty-five minutes after the time they first went on duty at Chaffee, the home terminal for this crew assignment. Pursuant to provisions of collective bargaining agreements between labor organizations and the Frisco, the members of the crew were paid for the period they spent at Crystal City along with the time they spent between Chaffee and Crystal City, and between Crystal City and St. Louis. There is

no express language in the collective bargaining agreements between the labor organizations and the Frisco specifically prohibiting the release from duty at Crystal City. The collective bargaining agreements provide for methods of payment to crew members, if they are so released, and also provide for the use of the Crystal Motel, which was used by the crew herein.

4. Although Crystal City was a "home" or "away-from-home" terminal for at least one Frisco train crew assignment made from an extra board at the time the incident involved occurred, Crystal City is, and was, neither the "home" nor "away-from-home" terminal for this or other crews assigned to trains operating from Chaffee to St. Louis, nor was it so specified or indicated as such in any collective bargaining agreement or bulletined assignments for crews assigned to trains operating from Chaffee to St. Louis.

5. If the crew members had completed their trip between Chaffee and St. Louis as originally scheduled, without the interim period at Crystal City, under the applicable labor contracts, they would have been paid as follows:

| | |
|---|---|
| Conductor | $55.65 |
| Brakemen | 51.51 |
| Engineer | 67.62 |

Because of the release for the interim period at Crystal City, the crew members were paid for the services on November 16th and 17th as follows:

| | |
|---|---|
| Conductor | $112.47 |
| Brakemen | 101.10 |
| Engineer | 144.76 |

Under the applicable labor contracts, if after release of the crew at Crystal City, the crew was deadheaded to St. Louis, and after the congestion in the St. Louis terminal had cleared, another crew was deadheaded to Crystal City to move the train to St. Louis, the crew members would have been paid as follows:

| | |
|---|---|
| Conductor | $117.52 |
| Brakemen | 105.88 |
| Engineer | 149.52 |

6. The trains, on occasions, are delayed in transit at intermediate points. The Government does not concede that Frisco had the right to release the involved crews at Crystal City.

7. Each member of the crew was, and is, a member of, or represent by, a labor organization: the engineer by the Brotherhood of Locomotive Engineers; the others by the United Transportation Union (hereinafter UTU). Accordingly, the rates of pay, rules, and working conditions of each were, and are, subject to the terms of collective bargaining agreements negotiated and administered by and between Frisco and their representative labor organizations, pursuant to the Railway Labor Act, 45 U.S.C. §§ 151 et seq. If and when Frisco allegedly violates the agreed rates of pay, rules, or working conditions of any employee in the position of any of the men involved here, the prescribed avenue of relief under the collective bargaining agreement is the filing and processing of an appropriate claim or grievance, pursuant to the provisions of section 3 of the Railway Labor Act, 45 U.S.C. § 153. No claims or grievances have been filed on behalf of any man in the crew involved herein with regard to their release at Crystal City. The Federal Railroad Administration's investigation of the release of these particular crew members was initiated as the result of a December 4, 1973, letter from J. R. Snyder, National Legislative Director of UTU the recognized bargaining agent for three members of this crew.

8. The Government has charged Frisco with violating the Act, alleging that it permitted the employees involved to remain continuously on duty in excess of twelve hours contrary to 45 U.S.C. § 62(a), the pertinent portion of which provides as follows:

"§ 62. *Employees' hours of service—Limitations*

(a) It shall be unlawful for any common carrier, its officers or agents, subject to sections 61 to 64b of this title—

(1) to require or permit an employee, in case such employee shall have been continuously on duty for twelve hours, to continue on duty or to go on duty

until he has had at least ten consecutive hours off duty . . . or

(2) to require or permit an employee to continue on duty or to go on duty when he has not had at least eight consecutive hours off duty during the preceding twenty-four hours."

The following portion of 45 U.S.C. § 61 is relevant in determining the "time on duty":

"(3) Time on duty shall commence when an employee reports for duty and terminate when the employee is finally released from duty, and shall include:

(A) Interim periods available for rest at other than a designated terminal;

(B) Interim periods available for less than four hours rest at a designated terminal; . . ."

It is agreed that "time on duty" does not include "interim periods available for rest" for four hours or more at a "designated terminal".

9. The collective bargaining agreements representing those crafts or classes of employees, whose work involves them in the actual operations of trains, use the phrase "designated terminal" in only one instance in each of said agreements. Such agreements do, however, contain a number of references to "designated home terminal" and "away-from-home terminal".

10. The Federal Railroad Administration has advised management that if, as a result of collective bargaining, Crystal City is agreed upon by management and labor as a "designated terminal" for this particular crew assignment, future action of the Frisco in relieving crews for four hours or more at Crystal City, as it did herein, would not be a violation of the Act.

11. The parties have stipulated that the issue to be decided is:

"Under the facts of this case was the release of the crew at Crystal City at a 'designated terminal' within the meaning of the Hours of Service Act."

## Conclusions of Law

■ 1. In reviewing the legislative history of the Act, it is clear that the Congress was alerted to the possibility that the term "designated terminal" would prove troublesome, unless specifically defined. *Hearings on S.1938 Before the Subcomm. on Surface Transportation of the Comm. on Commerce,* 91st Cong., 1st Sess. 193 (1969). Though the Congress failed to so define the term, the Senate Committee on Commerce did report that:

"The phrase 'designated terminals' in section 1(b)(3)(A) and (B) is intended to have that meaning commonly recognized in the railroad industry. The committee is advised that collective bargaining agreements provide a commonly understood definition for this term. As a minimum the committee intends that the term should mean generally a place where suitable food and lodging are available for employees." *S.Rep.No.91-604,* 91st Cong., 1st Sess., 1969 U.S.Code Cong. & Admin.News, p. 1640.

Despite the assurances by the Senate Committee on Commerce, this Court is unable to find any instance, in either the local or national collective bargaining agreements submitted by the parties, wherein the term "designated terminal" is defined. Moreover, in the very few instances the term is used in the collective bargaining agreements, it is almost exclusively used in conjunction with the terms "home terminal" or "away-from-home terminal". Accordingly, it is clear that the advice given the Committee concerning the presence of a definition in the collective bargaining agreements was erroneous, that the term is undefined, and that it is used to refer to those "home terminals" and "away-from-home terminals" which are specifically listed in the collective bargaining agreements.

■ 2. Plaintiff contends that based on the testimony given before the various House and Senate Committees, the term "designated terminal" has been defined as being those terminals which are designated as such in collective bargaining agreements. Specifically, plaintiff relies upon the testimony of R. R. Manion, then Vice-President, Operations and Maintenance Department,

Association of American Railroads, and spokesman for the railroads in opposition to the legislation, who stated:

"The term 'designated terminal' is used in the bills to identify the kind of place at which interim rest periods of appropriate length may be excluded from duty time and is distinguished from 'other than designated terminals' where all interim periods for rest are counted as time on duty.

"The term has significance in relation to the provisions of collective bargaining agreements and refers to terminals that are 'designated' in such agreements. It does not determine the question whether a given place is one at which suitable rest can be obtained.

"Our view is that any place where reasonable facilities for food and rest are available to employees should qualify as the kind of place at which interim rest periods—of suitable length—should not count as time on duty. This concept should be substituted for the technical term 'designated terminal.' Food and rest are the essential physical requirements for a meaningful rest period, and may well be obtainable at places that are not 'designated' in collective bargaining agreements." Hearings on S.1938, supra, at 138.

While this testimony does seem to define the term and strengthen the plaintiff's position, this support is substantially weakened when it is noted that this testimony is included in a record wherein the vast majority of testimony is ambiguous and confusing, at best, with regard to the term "designated terminal". Additionally, plaintiff notes that Congress failed to incorporate Manion's proposal into the Act. Though true, this does not change the fact that Congress failed to accept any proposal which specifically defined the term. Actually, the only step taken by Congress to specifically define the term was to set forth minimum requirements therefor. The parties have stipulated that the minimum requirements established by Congress were met with regard to this crew's stay at Crystal City, Missouri.

3. The Act ". . . is remedial and in the public interest, and should be construed in the light of its humane purpose", *Atchison, Topeka, & Santa Fe Ry. v. United States*, 244 U.S. 336, 343, 37 S.Ct. 635, 637, 61 L.Ed. 1175 (1917), and the purpose of the Act

". . . is to bring up to today's safety requirements and operating conditions the provisions established in 1907 . . . prohibiting railway employees engaged in or connected with the movement of trains from being required or permitted to be or remain on duty beyond a maximum of 16 hours, and specifying certain hours they must have off duty." *S.Rep.No.91–604*, 91st Cong., 1st Sess., 1969 U.S.Code Cong. & Admin.News, p. 1636.

Here, the crew was provided with suitable food and lodging after only three hours and forty-five minutes on duty, the crew was compensated for their stay at Crystal City in accordance with the terms of the applicable collective bargaining agreement, and no claims or grievances have been filed on behalf of any man in the crew. Even though Crystal City was not specifically designated as a "home terminal", "away-from-home terminal", or "designated terminal" in the collective bargaining agreements, it is abundantly clear that the crew was satisfied with the terms and conditions of their stay at Crystal City, and that the humane purpose of the Act was accomplished. Accordingly, Crystal City was a designated terminal within the meaning of the Act, and a judgment will be entered in favor of the defendant at the cost of the plaintiff.

4. The Court is aware of the fact that in reversing the United States District Court for the Northern District of California, *United States v. Atchison, Topeka & Santa Fe Ry.*, 363 F.Supp. 644 (1973), the Ninth Circuit Court of Appeals reached a contrary decision in a similar situation, *United States v. Atchison, Topeka & Santa Fe Ry.*, 525 F.2d 1184 (9th Cir. 1975), and that the Supreme court denied certiorari, 425 U.S. 992, 96 S.Ct. 2204, 48 L.Ed.2d 816 (1976). However, it is the opinion of this Court that in

order to accomplish the purposes of the Act, the decision reached above is proper.