**UNITED STATES of America, Appellant,**

v.

**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, Appellee.**

**No. 77–1533.**

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1977.

Decided March 1, 1978.

Rehearing Denied April 18, 1978.

---

Joseph B. Moore, Asst. U. S. Atty., St. Louis, Mo., argued, for United States; Barry A. Short (former U. S. Atty.), St. Louis, Mo., of counsel.

Grady Cothen, Jr., Atty., Federal Railroad Administration, Dept. of Transp., Washington, D. C., argued for Federal Railroad Administration; Raymond K. James, Chief Counsel, J. Thomas Furphy, Asst. Chief Counsel, Barbara Betsock, Trial Atty., Federal Railroad Administration, Dept. of Transp., Washington, D. C., of counsel.

Donal Turkal, St. Louis-San Francisco Railway Co., St. Louis, Mo., argued, for appellee; Donald E. Engle and Thomas H. Mug, St. Louis, Mo., on brief.

Philip F. Welsh and R. Scott Gardner, Assn. of American Railroads, Washington, D. C., Richmond C. Coburn, Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., on brief for amicus curiae, Assn. of American Railroads.

Lawrence M. Mann, Alper, Schoene, Horkan & Mann, Washington, D. C., John H. Haley, Jr., Haley, Fredrickson, Stubbs & Walsh, St. Louis, Mo., on brief for amicus curiae United Transportation Union.

Before LAY and BRIGHT, Circuit Judges, and SCHATZ, District Judge.*

BRIGHT, Circuit Judge.

The United States brought this action against the St. Louis-San Francisco Railway Company (Frisco) seeking to recover civil penalties for violations of the [Railroad] Hours of Service Act (Act), 45 U.S.C. §§ 61–64b (1970). The district court entered a judgment of dismissal,[1] and the United States brings this timely appeal. We affirm.

* ALBERT G. SCHATZ, United States District Judge, District of Nebraska, sitting by designation.

1. The Honorable James H. Meredith, Chief Judge, United States District Court for the Eastern District of Missouri. The district court opinion is reported at 431 F.Supp. 735 (E.D.Mo. 1977).

The parties stipulated all of the facts, which we summarize. At 6:00 a. m. on November 16, 1973, the four-member crew of Frisco Train No. 822 reported for duty at the crew's "home" terminal, namely, Chaffee, Missouri. The train departed Chaffee at 8:00 a. m. for a "through" trip to the St. Louis, Missouri, terminal at Lindenwood Yard, 138 miles north of Chaffee. St. Louis was the "away-from-home" terminal for the crew.[2]

At 10:40 a. m., the train arrived at Crystal City, Missouri, which is 105 miles north of Chaffee and 33 miles south of St. Louis. Because Lindenwood Yard at St. Louis was congested and could not accommodate the train, Frisco elected to release the four crew members from duty at 11:45 a. m. at Crystal City. Adequate facilities for food and lodging were available to the crew at Crystal City.

Crystal City was not a "home" or "away-from-home" terminal for this crew or for other crews assigned to trains operating from Chaffee to St. Louis, nor was it so specified or indicated in any collective bargaining agreement or bulletin for crews assigned to trains operating from Chaffee to St. Louis. However, Crystal City, according to provisions of the collective bargaining agreements did serve as a "home" or "away-from-home" terminal for another Frisco train crew assignment.

Following a relief of nine hours and fifteen minutes, the crew of Train No. 822 returned to duty at 9:00 p. m.[3] The train departed Crystal City at 10:50 p. m. and arrived at the "away-from-home" terminal, Lindenwood Yard, at 1:25 a. m. on November 17, 1973. At this time, a total of nineteen hours and twenty-five minutes had elapsed from the time the crew had commenced duty at Chaffee.

The Government in this action contends that Frisco violated the Hours of Service Act by requiring the four crew members to remain on duty for more than twelve hours. It counts the time spent by the crew at Crystal City as duty time under the Act. Frisco argues to the contrary. On this appeal, we must determine whether Crystal City constituted a "designated terminal" under the provisions of the Act. If it does, the time spent there by the crew is not deemed "duty" time and Frisco is not in violation of the Act.

I.

Under 45 U.S.C. § 62(a)(1),[4] it is unlawful for a common carrier, such as Frisco, to require or permit an employee who has been continuously on duty for twelve hours to go on duty or to continue on duty until the employee has had at least ten consecutive hours off duty. What constitutes time on duty is determined by 45 U.S.C. § 61(b)(3).[5] Interim periods for rest at other than a designated terminal constitute "time on duty" for purposes of the Act. The parties agree that an interim period available for rest for four hours or more at a "designated terminal" does not constitute "time on duty" under the Act. Hence, if the Government establishes Crystal City as a place "other than a designated terminal," the crew must be deemed on duty for more than seven hours beyond the twelve-hour duty time permitted by the Act and the

---

**2.** We discuss these terms, "home" and "away-from-home" terminal, *infra.*

**3.** Pursuant to provisions of collective bargaining agreements, the members of the crew were paid for the period they spent at Crystal City.

**4.** 45 U.S.C. § 62(a)(1) provides in part:

(a) It shall be unlawful for any common carrier, its officers or agents, subject to sections 61 to 64b of this title—

(1) to require or permit an employee, in case such employee shall have been continuously on duty for [twelve] hours, to continue on duty or to go on duty until he has had at least ten consecutive hours off duty * * *.

**5.** 45 U.S.C. § 61(b)(3) provides in part:

(b) For the purposes of sections 61 to 64b of this title—

* * * * * *

(3) Time on duty shall commence when an employee reports for duty and terminate when the employee is finally released from duty, and shall include:

(A) Interim periods available for rest at other than a designated terminal;

(B) Interim periods available for less than four hours rest at a designated terminal[.]

Railroad must accordingly be deemed guilty of violations of that Act. But if Crystal City qualifies as a designated terminal under the stipulated facts, the crew would be deemed on duty for purposes of the Act for less time than twelve hours and the facts would not establish any violation by the Railroad.

The Government interprets the term "designated terminal," as used in section 61(b)(3)(A), to mean a railroad terminal established in or under a collective bargaining agreement as the "home" terminal or "away-from-home" terminal for the particular crew assignment, provided that the terminal has adequate facilities for food and lodging. According to the Government, because Crystal City was not the "home" or "away-from-home" terminal for this particular crew assignment, it was not a "designated terminal" under the Act.

II.

The statute does not define the term "designated terminal." In its report on the 1969 legislation,[6] the Senate Committee on Commerce stated with respect to the provision now in question:

> The phrase "designated terminals" in section 1(b)(3)(A) and (B) is intended to have that meaning commonly recognized in the railroad industry. The committee is advised that collective bargaining agreements provide a commonly understood definition for this term. As a minimum the committee intends that the term should mean generally a place where suitable food and lodging are available for employees. [S.Rep.No.91–604, 91st Cong., 1st Sess., 1969 U.S.Code Cong. & Admin.News, pp. 1636, 1640.]

Although the Senate Committee refers to collective bargaining agreements as providing the commonly understood definition of this term, the stipulation of the parties indicates that collective bargaining agreements between railroads and railroad unions rarely use the term "designated terminal." The parties stipulated as follows:

> The collective bargaining agreements representing those crafts or classes of employees whose work involves them in the actual operations of trains, use the phrase "designated terminal" in only one instance in each of said agreements. Such agreements do, however, contain a number of references to "designated home terminal" and "away-from-home terminal".

Portions of six collective bargaining agreements involving major railroads were stipulated into evidence. In one of the agreements, the term "designated terminal" is used in conjunction with "home" and "away-from-home" terminals for the purpose of allocating crew assignments. Otherwise, railroad terminals are referred to as "home" or "away-from-home" terminals or as "established" for various purposes, for example, to determine the rate of pay for "held" time. The record establishes neither a common definition nor a consistent use of the term "designated terminal" in railroad collective bargaining agreements.

The Government contends that testimony given by various railroad industry representatives and others before a subcommittee of the Senate Committee on Commerce, and before a House Committee considering a parallel bill, shows that the industry understood the statutory term of "designated terminal" to mean a "home" terminal or an "away-from-home" terminal. The Government relies primarily on testimony given by Mr. R. R. Manion, then vice president of the Association of American Railroads (AAR). In that testimony, Mr. Manion criticized the use of the term "designated terminal" in the new legislation, and interpreted that language to refer "to terminals that are 'designated' in [collective bargaining] agreements."[7] The AAR also advanced an

---

**6.** Congress introduced the term "designated terminal" into § 1(b)(3) of the Hours of Service Act, 45 U.S.C. § 61(b)(3), by the Act of December 26, 1969, Pub.L. 91–169, 83 Stat. 463 (1969), which was designed to update the safe-

ty provisions of the Hours of Service Act, originally enacted in 1907.

**7.** The Government quotes the following testimony of Mr. Manion:

amendment to the proposed legislation that would delete the words "other than a designated terminal" and would substitute the words "a place where reasonable facilities for food and rest are not available for employees." Hearings on S. 1938, *supra* at 153. The Senate did not adopt the AAR proposal.

The comments and proposed amendments of industry representatives offer little assistance in determining Congressional intent. This sort of evidence often reflects an industry's construction of proposed legislation, taken in the worst light from that industry's standpoint. After examining the testimony referred to by the Government, the amendment proposed by the AAR, and other legislative history of the provision in question, we agree with the district court that the legislative history is unclear as to the meaning of the term "designated terminal." The strongest evidence of Congressional intent must come from the language of the Act and from comments by the Congress.

The excerpt from the Senate Committee report, quoted at p. 1227 *supra,* carries substantial weight with respect to the Congressional intent. Though the Congress did not define the term "designated terminal," leaving the meaning to collective bargaining agreements, the Committee report emphasized that the term should mean generally "a place where suitable food and lodging are available for employees."

The statute provides for "interim periods" of rest. This term contemplates an intermediate stopping place for rest between the place where an employee "reports for duty" and that where the employee is "finally released from duty."[8] Neither the "home" nor the "away-from-home" terminal was an interim point on the train journey here in question, although a "home" or "away-from-home" terminal could constitute an interim point on other train runs. We construe the statutory term "designated terminal" as connoting an *interim* rest point such as Crystal City, not

> The pending bills provide that interim periods available for rest shall be counted as time on duty except those lasting 4 or more hours at what are referred to as "designated terminals." The term "interim period available for rest" is not defined, nor is the term "designated terminal."
>
> The existing hours of service statute contains no provision relating to interim rest periods. The Federal courts, in construing the law, have determined that respite periods that are of sufficient duration and are afforded under suitable circumstances should not be counted as time on duty, and that the adequacy of a given rest period is a question of fact in light of all the circumstances. Periods of 2 hours, for example, have been held to be sufficient to be excluded from duty time.
>
> The term "designated terminal" is used in the bills to identify the kind of place at which interim rest periods of appropriate length may be excluded from duty time and is distinguished from "other than designated terminals" where all interim periods for rest are counted as time on duty.
>
> *The term has significance in relation to the provisions of collective bargaining agreements and refers to terminals that are "designated" in such agreements.* It does not determine the question whether a given place is one at which suitable rest can be obtained.
>
> *Our view is that any place where reasonable facilities for food and rest are available to employees should qualify as the kind of place at which interim rest periods—of suitable length—should not count as time on duty. This concept should be substituted for the technical term "designated terminal."* Food and rest are the essential physical requirements for a meaningful rest period, and may well be obtainable at places that are not "designated" in collective bargaining agreements.

Hearings on S. 1938 before the Subcomm. on Surface Transportation of the Senate Committee on Commerce, 91st Cong., 1st Sess., 138 (1969) (emphasis supplied). Other portions of Mr. Manion's testimony relied on by the Government appear at Hearings on S. 1938, *supra* at 122–23 and Hearings on H.R. 8447 before the House Comm. on Interstate and Foreign Commerce, 91st Cong., 1st Sess. 135 (1969).

8. The phrases "reports for duty" and "finally released from duty" as used in 45 U.S.C. § 61(b)(3) determine, respectively, the points in time when an employee's duty time commences and terminates. The stipulation of the parties does not state that crew members were finally released from duty upon their arrival at Lindenwood Yard at St. Louis. However, that the crew was finally released there is evident from the computations of duty time advanced by the parties.

necessarily limited to "home" and "away-from-home" terminals as those terms are used in collective bargaining agreements.

In reaching this conclusion, we are mindful that the purpose of the Act is to promote the safe operation of trains. *Atchison, Topeka & Santa Fe Railway Co. v. United States*, 244 U.S. 336, 342, 37 S.Ct. 635, 61 L.Ed. 1175 (1917); *Chicago & Alton Railroad Co. v. United States*, 247 U.S. 197, 199–200, 38 S.Ct. 578, 62 L.Ed. 1242 (1918). The interpretation offered by appellant United States does not enhance safety but serves only to burden efficient railroading.[9]

III.

■ The burden of establishing a violation of the Act by Frisco rested upon the United States. The applicable collective bargaining agreement did not use the language "designated terminal." Frisco released the crew at an interim point in the train journey, Crystal City, for a rest period of more than four hours. The parties have stipulated that adequate facilities for food and lodging were available for the crew at Crystal City. Also, they have stipulated that for at least one Frisco crew assignment, Crystal City is specified under a collective bargaining agreement as a "home" or "away-from-home" terminal. Under these circumstances, the Government failed to prove any violation and we affirm the dismissal of the action.

We recognize that the Ninth Circuit has applied a rationale contrary to ours in deciding *United States v. Atchison, Topeka & Santa Fe Railway Co.*, 525 F.2d 1184 (9th Cir. 1975), *cert. denied*, 425 U.S. 992, 96 S.Ct. 2204, 48 L.Ed.2d 816 (1976). We do note factual differences in these two cases. In any event, we believe that Chief Judge Meredith has reached a proper result in this case by giving the statute a reading which accords with congressional intent.

Affirmed.

9. According to comments of counsel at oral argument, Frisco could have avoided the Government's charge of violating the Act by transporting the crew 33 miles to St. Louis to rest for at least four hours and then transporting the crew back to Crystal City to continue the movement of the train into the St. Louis yards.